# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

03 MDL 1570 (GBD)(SN)

This document relates to: *All Actions*

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTERS ROGATORY) FOR THE TAKING OF EVIDENCE IN CIVIL OR COMMERCIAL MATTERS BY THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

The United States District Court for the Southern District of New York (the "Court"),

presents its compliments to the Canada Revenue Agency ("CRA"), and requests international

judicial assistance to obtain interaction and evidence to be used in a civil proceeding before this

Court in the above-captioned matter.

## I. REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

### A. Sender

The Honorable Sarah Netburn, United States Magistrate Judge for the Southern District

of New York, United States of America.

### B. Receiving Authority

Cathy Hawara, Assistant Commissioner, Appeals, Canada Revenue Agency, Ottawa,

Ontario.

### C. Person to Whom the Executed Request is to be Returned

This Court hereby requests that the following attorneys for the Plaintiffs and attorneys for

Defendants World Assembly of Muslim Youth-Saudi Arabia ("WAMY-SA") and World

Assembly of Muslim Youth-International ("WAMY-INTL"), as officers of this Court, be

permitted to take the oral testimony by deposition of Cathy Hawara, which testimony will be

recorded by stenographic means and videotaped:

| Sean P. Carter, Esquire | Robert Haefele, Esquire | Andrew Maloney, Esquire |
|---|---|---|
| Cozen O'Connor | Motley Rice, LLC | Kreindler & Kreindler, LLP |
| 1650 Market Street | 28 Bridgeside Boulevard | 750 Third Avenue |
| Philadelphia, PA 19103 | Mt. Pleasant, SC 29465 | New York, NY 10017 |
| United States of America | United States of America | United States of America |

Omar T. Mohammedi, Esquire
Law Firm of Omar T. Mohammedi, LLC
233 Broadway, Suite 820
New York, NY 10279
United States of America

Frederick J. Goetz, Esquire
Goetz & Eckland P.A.
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
United States of America

Upon completion of the deposition, I request that all transcripts and documentary

materials relating to the deposition be delivered to the custody and control of Sean P. Carter of

Cozen O'Connor, who will act as the confidential courier of this Court and hand-deliver those

materials directly to me at the following address:

The Honorable Sarah Netburn
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

All transcripts and materials deposited with the Court in accordance with the

requirements of this section and governing Case Management Orders shall be made available

forthwith to all parties.

## D.    Purpose for the Testimony Requested

All oral testimony and documentary materials relating to the deposition will be used in

relation to the above-captioned civil lawsuit.

## II. LETTERS ROGATORY REQUIREMENTS

### A. Request for Assistance

This Court requests the assistance described herein as necessary in the interests of justice.

The assistance requested is that the appropriate authority at the CRA, identified herein, appear

before a person authorized to administer oaths and provide oral testimony on the topics more

specifically detailed herein.

### B. Requesting Judicial Authority

The Honorable Sarah Netburn
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

### C. To the Competent Authority of the Canada Revenue Agency

Cathy Hawara
Assistant Commissioner, Appeals
Canada Revenue Agency
Connaught Building
555 MacKenzie Avenue, 7th Floor
Ottawa, ON K1A 0L5

### D. Names and Addresses of the Parties and their Representatives

#### 1. Plaintiffs

Plaintiffs in this civil lawsuit are the family members of the nearly 3,000 people killed in

the September 11th Attacks, individuals who were seriously injured as a result of the Attacks, and

commercial entities which have suffered billions of dollars of economic damages as a result of

the Attacks. Through the instant civil lawsuit, those victims of the September 11th Attacks seek

to hold accountable individuals and organizations alleged to have provided financial, physical,

logistical, ideological, and other forms of material support and resources to al Qaeda and its

affiliates.

3

## 2. Plaintiffs' Representatives

The victims of the September 11th Attacks are represented by their respective counsel.

For purposes of these Letters Rogatory, the victims have appointed the following members of the

Plaintiffs' Executive Committees ("PECs") to serve as their representatives:

| Sean P. Carter, Esquire | Robert Haefele, Esquire | Andrew Maloney, Esquire |
|---|---|---|
| Cozen O'Connor | Motley Rice, LLC | Kreindler & Kreindler, LLP |
| 1650 Market Street | 28 Bridgeside Boulevard | 750 Third Avenue |
| Philadelphia, PA 19103 | Mt. Pleasant, SC 29465 | New York, NY 10017 |
| United State of America | United States of America | United States of America |

## 3. Defendants

Defendants al Qaeda, et al., are organizations, states, and individuals, who are alleged by

Plaintiffs to have provided financial, logistical, ideological, or other forms of material support to

al Qaeda or its affiliates. The named defendants include World Assembly of Muslim Youth-

Saudi Arabia ("WAMY-SA") and World Assembly of Muslim Youth-International ("WAMY-

INTL"). Civil discovery proceedings are ongoing as to WAMY-SA and WAMY-INTL in this

litigation.

## E. Nature and Purpose of the Proceedings

This is a civil lawsuit instituted by victims of the September 11th Attacks, through which

those victims seek to hold alleged sponsors and supporters of al Qaeda and its affiliates legally

accountable for injuries resulting from the Attacks.

## F. Evidence to be Obtained

Upon information, the Canadian government's Canada Revenue Agency ("CRA"), under

the leadership of CRA Assistant Commissioner Cathy Hawara, conducted an extensive

investigation into the operations and activities of WAMY-SA and its Canadian branch office

("WAMY-Canada"). Arising from concerns that WAMY-Canada was failing to comply with the

4

Canadian government's reporting requirements for purported charitable entities seeking tax exempt status in that country, the CRA reportedly conducted an audit of WAMY-Canada's financial books, records, and other materials, including a review of WAMY-Canada's registered Charity Information Returns ("T3010's").

The CRA's investigation reportedly concluded that: (1) "WAMY maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities;" (2) WAMY-Canada shared common officers, officer space, contact information, and bank accounts with Benevolence International Fund-Canada ("BIF-Canada"); (3) WAMY-Canada provided funding to Benevolence International Foundation ("BIF-USA"); and (4) WAMY-Canada distributed literature and other materials produced by WAMY-Saudi Arabia which "in [the CRA's] view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change."

It is the understanding of this Court that at the conclusion of the above-mentioned investigation and audit, the CRA notified WAMY-Canada that the Canadian government intended to revoke its designation as a tax exempt registered charity after thirty (30) days. A true and correct copy of then Director General Cathy Hawara's January 5, 2012 "Notice of Intention to Revoke the World Assembly of Muslim Youth" is attached hereto as Exhibit A. It is further the understanding of this Court that the thirty (30) day timeframe set forth in the January 6, 2012 letter passed and the Canadian government did in fact revoke WAMY-Canada's designation as a tax exempt registered charity.

Accordingly, this Court, in the spirit of comity and reciprocity, herein grants the Plaintiffs' request for this Letter Rogatory and requests that Cathy Hawara appear before a

person authorized to administer oaths and provide oral testimony on the topics set forth below. Through the recitation of these facts and the issuance of this Order, this Court has not made any judicial findings or reached any conclusions with respect to the merits of Plaintiffs' claims or the allegations contained therein.

## III. SPECIFIC REQUESTS OF THIS LETTER ROGATORY

This Court respectfully requests that, in response to this Letter Rogatory, Cathy Hawara appear before a person authorized to administer oaths, and provide oral testimony on the following topics. Topics 1-11 are areas of inquiry the Plaintiffs intend to pursue through testimony of Ms. Hawara, and topics 12-14 are added at the request of Defendants WAMY-SA and WAMY-INTL only:

1. The investigation and audit conducted by the CRA concerning WAMY-Canada, WAMY-SA, WAMY-SA's North American Committee, WAMY-United Kingdom (UK), WAMY-Australia, Ayman al Taher, Mohamad Khatib, and Talhal al Jarad as described in Exhibit A, including any and all documents, evidence, or other materials concerning the investigation and audit.

2. Any and all correspondence or communications between and among the CRA,WAMY-Canada, WAMY-SA, WAMY-INTL, Ayman al Taher, Mohamad Khatib, Talhal al Jarad, and/or any other representative of the World Assembly of Muslim Youth relating to the investigation and audit described in Exhibit A.

3. Any and all documents, evidence, or other materials reviewed and analyzed by the CRA relative to the audit of WAMY-Canada, including but not limited to, WAMY-Canada's Registered Charity Information Returns ("T3010's"), WAMY-Canada's financial and accounting records, and WAMY-Canada's bank account records.

6

4. WAMY-Canada's non-compliance with Canada's *Income Tax Act*, including but not limited to, WAMY-Canada's failure to maintain proper financial books and records in accordance with the Act, and WAMY-Canada's donations and/or gifts to "non-qualified" donees.

5. WAMY-Canada's relationship with WAMY-SA, including but not limited to, WAMY-SA's control and supervision over WAMY-Canada's operations and finances.

6. Annual reports prepared by WAMY-Canada and provided to WAMY-SA.

7. WAMY-Canada, WAMY-SA, and/or WAMY-INTL's links to terrorism, extremism, or criminal activity.

8. Any and all documents, evidence, or other materials provided to, and/or received from, the Financial Action Task Force ("FATF") relating to WAMY-Canada, WAMY-SA, WAMY-INTL, and/or any other entity or individual associated with the World Assembly of Muslim Youth.

9. WAMY-Canada, WAMY-SA, and/or WAMY-INTL's relationship with Benevolence International Fund ("BIF-Canada"), including but not limited to, information relating to Mohamed Khatib and any other individual(s) working simultaneously for WAMY-Canada and BIF-Canada, shared office space, shared contact information, and shared bank account(s) at Bank of Montreal.

10. WAMY-Canada, WAMY-SA, and/or WAMY-INTL's relationship with Benevolence International Foundation ("BIF-USA"), including but not limited to, information relating to the transfer of any and all funds between WAMY-Canada and BIF-USA.

11. WAMY-Canada, WAMY-SA, and/or WAMY-INTL literature or other materials which "promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of

7

violence as a means to bring about political or societal change."

12.     Any and all documents, evidence, or other materials provided to, and/or received from, the Financial Action Task Force from any representative of the Plaintiffs.

13.     WAMY-SA literature or other materials that were obtained or at all considered by the CRA.

14.     WAMY-SA's September 3, 2015 letter denying its support of terrorism and seeking a retraction of certain allegations that WAMY-SA supports terrorism (a copy of which, along with the January 22, 2016 response of the CRA, is enclosed herewith as Exhibit B).

## IV.     OTHER REQUIREMENTS OF LETTER ROGATORY

### A.     Fees and Costs

Plaintiffs are responsible for reasonable costs associated with securing the court reporter and videographer. Each side shall bear its own costs in securing copies of the deposition transcript and exhibits, and/or video or audio recording.

### B.     Reciprocity

This Court expresses its sincere willingness to provide similar assistance to the CRA, if future circumstances so require.

## V. CONCLUSION

This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Letter Rogatory seeking the oral testimony by deposition of Cathy Hawara, Canada Revenue Agency.

Dated: _4/25_, 2019

The Honorable Sarah Netburn
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

LEGAL\41751902\1

9

# Exhibit A

To the Plaintiffs' Executive Committees' July 24, 2019
Request for International Judicial Assistance (Letter Rogatory)


JAN 0 5 2012

**REGISTERED MAIL**

World Assembly of Muslim Youth
70-3024 Cedarglen Gate
Mississauga ON L5C 4S3

BN: 871966040RR0001

<u>Attention: Mr. Ayman Al-Taher, President</u>       File #: 3008146

**Subject:**    **Notice of Intention to Revoke the**
                 <u>**World Assembly of Muslim Youth**</u>

Dear Mr. Al-Taher:

      I am writing further to our letter dated August 23, 2011 (copy enclosed), in which you were invited to submit representations as to why the registration of the World Assembly of Muslim Youth (the Organization) should not be revoked in accordance with subsection 168(1) of the *Income Tax Act*.

      The Organization was given until September 22, 2011, to respond to the specific areas of serious non-compliance raised in our letter of August 23, 2011. As of this date, we have not received any response to our letter. Therefore, the Canada Revenue Agency's (CRA) concerns regarding the Organization's non-compliance have not been alleviated.

**Conclusion:**

      On the basis of our audit and of our review of the Organization's Registered Charity Information Returns for the years from 2005 to 2009, we have concluded that the Organization: failed to comply with or contravened subsection 230(2) of the Act; ceased to comply with the requirements of the Act for its continued registration; and failed to file an information return as required under the Act.

      Our analysis of the Organization's operations has led the CRA to believe that the Organization, which has been inactive since at least 2005, was established to support the goals and operations of its parent organization located in Saudi Arabia, which has been alleged to support terrorism. Our analysis particularly noted that the Organization shared a common director, contact information, and a bank account with the Benevolence International Fund in Canada (BIF-Canada), and provided $50,246 to the Benevolence International Foundation in the United States (BIF-USA) in 2001. On November 21, 2002, BIF-Canada and BIF-USA were added to the Consolidated List of the United Nations Security Council's Al-Qaida and Taliban and Sanctions Committee, as entities belonging to, or associated with, Al-Qaida.

# Canada

Consequently, for each of the reasons set out in our letter dated August 23, 2011, I wish to advise you that, pursuant to subsection 168(1) of the Act, I propose to revoke the registration of the Organization. By virtue of subsection 168(2) of the Act, revocation will be effective on the date of publication of the following notice in the *Canada Gazette*:

*Notice is hereby given, pursuant to paragraph 168(1)(b), 168(1)(c), and 168(1)(e) of the Income Tax Act, that I propose to revoke the registration of the organization listed below and that the revocation of registration is effective on the date of publication of this notice.*

**Business Number**            **Name**
871966040RR0001            World Assembly of Muslim Youth

Should you wish to object to this notice of intention to revoke the Organization's registration in accordance with subsection 168(4) of the Act, a written Notice of Objection, which includes the reasons for objection and all relevant facts, must be filed within **90 days** from the day this letter was mailed. The Notice of Objection should be sent to:

> Tax and Charities Appeals Directorate
> Appeals Branch
> Canada Revenue Agency
> 250 Albert Street
> Ottawa ON K1A 0L5

A copy of the revocation notice, described above, will be published in the *Canada Gazette* after the expiration of 30 days from the date this letter was mailed. The Organization's registration will be revoked on the date of publication, unless the CRA receives an order, within **the next 30 days**, from the Federal Court of Appeal issued under paragraph 168(2)(b) of the Act extending that period.

Please note that the Organization must obtain a stay to suspend the revocation process, notwithstanding the fact that it may have filed a Notice of Objection.

## Consequences of Revocation

As of the effective date of revocation:

a) the Organization will no longer be exempt from Part I Tax as a registered charity and will no longer be permitted to issue official donation receipts. This means that gifts made to the Organization would not be allowable as tax credits to individual donors or as allowable deductions to corporate donors under subsection 118.1(3), or paragraph 110.1(1)(a), of the Act, respectively;

b) by virtue of section 188 of the Act, the Organization may be required to pay a tax within one year from the date of the Notice of Intention to Revoke. This revocation

tax is calculated on prescribed form T-2046, *Tax Return Where Registration of a Charity is Revoked* (the Return). The Return must be filed, and the tax paid, on or before the day that is one year from the date of the Notice of Intention to Revoke. A copy of the relevant provisions of the Act concerning revocation of registration, the tax applicable to revoked charities, and appeals against revocation, can be found in Appendix A, attached. Form T-2046, and the related Guide RC-4424, *Completing the Tax Return Where Registration of a Charity is Revoked*, are available on our website at http://www.cra-arc.gc.ca/charities; and

c) the Organization will no longer qualify as a charity for purposes of subsection 123(1) of the *Excise Tax Act* (ETA). As a result, the Organization may be subject to obligations and entitlements under the ETA that apply to organizations other than registered charities. If you have any questions about your GST/HST obligations and entitlements, please call GST/HST Rulings at 1-888-830-7747 (Quebec) or 1-800-959-8287 (rest of Canada).

Finally, I wish to advise that subsection 150(1) of the Act requires that every corporation (other than a corporation that was a registered charity throughout the year) file a *Return of Income* with the Minister in the prescribed form, containing prescribed information, for each taxation year. The *Return of Income* must be filed without notice or demand.

Yours sincerely,

Cathy Hawara
Director General
Charities Directorate

Attachments:
- Appendix A - Relevant Provisions of the Act
- CRA letter dated August 23, 2011

c.c.: Farid Ahmed

**REGISTERED MAIL**

Canada Revenue    Agence du revenu
Agency            du Canada

The World Assembly of Muslim Youth
70-3024 Cedarglen Gate
Mississauga ON L5C 4S3

Your file

Our file

Attention:    Mr. Ayman Al-Taher, President

BN:    871966040RR0001
File #: 3008146

August 23, 2011

Subject:    **Audit of the World Assembly of Muslim Youth**

Dear Mr. Al-Taher:

This letter is further to our audit of the books and records of the World Assembly of Muslim Youth (WAMY) by the Canada Revenue Agency (CRA). The audit related to the operations of the registered charity for the period from January 1, 2000 to December 31, 2003. A review of the Registered Charity Information Return(s) (T3010's) for the fiscal periods ending December 31, 2005, 2006, 2007, 2008 and 2009 were also performed.

The CRA has completed its review of WAMY's operations and has identified specific areas of serious non-compliance with core requirements of the *Income Tax Act* in the following areas:

| | Issue | Reference |
|---|---|---|
| 1. | Failed to comply with or contravened any of sections 230 to 231.5 of the Act. | 230(2), 168(1)(e) |
| 2. | Ceased to comply with the requirements of the Act for continued registration | 149.1(1), 168(1)(b) |
| 3. | Failed to file an information return as required under the Act | 149.1(14), 168(1)(c) |

The purpose of this letter is to describe the areas of non-compliance identified by the CRA during the course of the audit as they relate to the legislative and common law requirements applicable to registered charities, and to provide WAMY with the opportunity

**Canadä**

to respond to the areas of concern identified below and to provide reasons why its status as a registered charity should not be revoked.

## 1. Failed to comply with or contravened any of sections 230 to 231.5 of the Act (Paragraph 168(1)(e) of the Act)

### 1.1 Failure to maintain books and records in accordance with the Act

Subsection 230(2) of the Act requires that every registered charity keep books and records of account at an address in Canada recorded with the Minister containing information in such form as will enable the Minister to determine whether there are any grounds for the revocation of its registration.[1]

A key component of the CRA's ability to ensure compliance is through audit verification of a charity's books and records. Our audit findings reveal that WAMY did not maintain proper books and records in accordance with the Act. In this regard, deficiencies noted during the period under audit include the following:

- failure to maintain a general ledger or similar record of receipts and expenditures;
- unable to provide any cancelled cheques for its fiscal year ending December 31, 2001, and cancelled cheques number 5, 26 through 32, and 51 were missing from its records for fiscal year ending December 31, 2002;
- failure to maintain a minute book or hold board meetings in accordance with its corporate by-laws;
- the accuracy and accounting of receipts were inadequate;
- unable to provide copies of official donation receipts 30 through 82 for the fiscal year ending December 31, 2002; and
- failure to maintain bank deposit slips for any of the fiscal years that were under audit.

WAMY's failure to maintain essential books and records has limited the CRA's ability to verify the nature and recipients of payments, confirm all revenues, and expenditures as recorded or verify the accuracy of its official donation receipts. For example, the CRA was unable to reconcile the revenue reported to deposits in the corporate bank account for the 2001 and 2002 taxation years. In addition, the absence of key corporate records such as

---

[1] Subsection 230(2) of the Act, states that: "every registered charity... shall keep records and books of account at an address in Canada recorded with the Minister or designated by the Minister containing:

a) information in such form as will enable the Minister to determine whether there are any grounds for the revocation of its registration under this Act;

b) a duplicate of each receipt containing prescribed information for a donation received by it; and

c) other information in such form as will enable the Minister to verify the donations to it for which a deduction or tax credit is available under this Act."

meeting minutes has not allowed the CRA to determine the nature and intended purpose of WAMY's business dealings, what relationships have been developed, and who, effectively, exercises ultimate control over the arrangements or transactions.

It is our view that these records should have been maintained and should have been readily available for audit and verification of the organization's continued eligibility for registration. Consequently, it is our view that WAMY has not met the requirements set out in subsection 230(2) of the Act that a registered charity keep "information in such form as will enable the Minister to determine whether there are any grounds for the revocation of its registration under this Act".

## 2. Ceased to comply with the requirements of the Act for its continued registration (Paragraph 168(1)(b) of the Act)

WAMY is registered as a charitable organization. Subsection 149.1(1) of the Act requires that a charitable organization devote all of its resources to "charitable activities carried on by the organization itself". There are two key aspects to this definitional requirement: an organization's activities must be charitable at law and it must devote its resources to the conduct of its own charitable activities.

### 2.1 Charitable Purposes and Activities

To continue to qualify for registration as a charity under the Act, an organization must be established for charitable purposes that oblige it to devote all its resources to its own charitable activities. This is a two-part test. Firstly, the purposes it pursues must be wholly charitable and secondly, the activities that a charity undertakes on a day-to-day basis must support its charitable purposes in a manner consistent with charitable law. Charitable purposes are not defined in the Act and it is therefore necessary to refer, in this respect, to the principles of common law governing charity. An organization that has one or more non-charitable purposes or devotes resources to activities undertaken in support of non-charitable purposes cannot be registered as a charity.

A registered charity must be able to demonstrate through documented evidence and proper books and records that it undertook charitable activities in furtherance of charitable purposes and must demonstrate that it operated in compliance with the Act at all times. It is our view, based on the audit findings that WAMY does not operate for charitable purposes.

It is a basic and important principle of charity law that the stated objectives of an organization must be expressed in precise rather than broad terms and identify as clearly as possible a recognized charitable purpose in order to ensure that an organization does not have the legal capacity to engage in non-charitable activities. Where there is any doubt as to whether a purpose is charitable, or where there is a mix of charitable and non-charitable purposes and activities, the courts have determined that an organization should not be

recognized as a charity. In its October 24, 2006 decision in *Travel Just*,[2] the Federal Court of Appeal reaffirmed the principles outlined in the Supreme Court of Canada's *Vancouver Society*[3] decision, that an organization is not entitled to registration as a charity under the Act if its corporate purposes are not exclusively charitable.[4]

WAMY's formal purposes (objects) are found in Part III of its Letters Patent under the *Canada Corporations Act*.[5] It is the CRA's preliminary view that object 3 "to provide training and resources to anyone interested in Islam and Muslims;" and object 4 "to support and cooperate with all humanitarian and Islamic organizations and individuals interested in advancing similar charitable objectives" are extremely broad and vague in scope. While these objects were previously accepted for registration on the basis of WAMY's representations to the CRA concerning its activities at that time, the CRA cautioned WAMY that object 4 did not permit the organization to provide funding to non-qualified donees "for projects merely on the basis that an individual or organization receiving the charity's funds will devote those resources that are *bona fide* and in line with the charity's own objectives".[6] The audit findings, as outlined below in section 2.3, reveal that WAMY has gifted to non-qualified donees despite the CRA's previous warning.

We also note that the pamphlets and other literature obtained from WAMY during the audit appear to indicate that WAMY may be pursuing objectives that are in fact quite different from those for which it was incorporated. The objectives outlined in one of these publications[7] are listed below:
1.  to serve the true Islamic ideology based on Tawheed, the Unity of God;
2.  to consolidate the factors of ideological unity and strengthen the Islamic fraternal relationship among Muslim youth;

---

[2] *Travel Just* v. *Canada (Minister of National Revenue)* [2006] FCA 343
[3] *Vancouver Society of Immigrant and Visible Minority Woman* v. *Minister of National Revenue* [1999] 1 SCR 10
[4] See *Travel Just* v. *Canada (Minister of National Revenue)* [2006] FCA 343 at para 3, and *Earth Fund/Fond pour la Terre* v. *Canada (Minister of National Revenue)* [2002] FCA 498 at para 20.

1) To preach, promote and advance the spiritual teachings of Islam by teaching the religious observances, tenets, and doctrines associated with Islam through modern and innovative ways;
2) To support and maintain missions and missionaries in order to propagate the faith;
3) To provide training and resources to anyone interested in Islam and Muslims;
4) To support and cooperate with all humanitarian and Islamic organizations and individuals interested in advancing similar charitable objectives;
5) To establish a think tank and research centre to develop Islamic Thought and provide resources to students, members, academics, the media, and anyone else interested in Islam; and
6) For the purposes aforesaid, and as incidental and ancillary thereto:
   a) To acquire and hold land for the purposes of a place of worship, to hold meetings, classes, and a library; and
   b) To operate a printing or publishing office in order to print, publish and distribute religious books, magazines, papers, research monographs and other religious literature related to the charitable objects.

[6] Notification of Registration letter to WAMY dated 2000-02-28.
[7] Towards Understanding Islam by Abul A'La Mawdudi, translated by Khurshid Ahmad, 1989

3. to introduce Islam to the world using all available means;
4. to support the constructive role of youth and students in developing an Islamic Society; and
5. to assist Islamic youth organizations all over the globe by coordinating their activities and helping them to implement their projects.

Furthermore, a second flyer[8] distributed by WAMY described its purposes as being:
1. to preserve the identity of Muslim youth and to overcome problems facing them in modern society;
2. to educate Muslim youth to become positive citizens;
3. to introduce Islam to non-Muslims in its purest form;
4. to assist Muslim youth organizations; and
5. to establish a dialogue between Muslim youth organizations and western society.

We must advise that several of the objectives outlined above are broad and vague, and could therefore be used to promote ends that are not exclusively charitable. Thus, it appears that the objects that WAMY communicates to the public, which are not the purposes for which it was incorporated, are so broad in scope that they place no restriction whatsoever on the manner in which they are to be pursued, and could permit WAMY to undertake a variety of activities that are not necessarily charitable at law.

With regard to its current activities, WAMY has reported on its 2005 to 2009 T3010's that it was inactive. However, WAMY's 2008 and 2009 T3010s list capital assets outside of Canada and under Section C, New Programs it indicates an orphan program and welfare program for the poor and needy. Moreover, Mr. Al-Taher advised the CRA, in a January 14, 2011 telephone conversation that WAMY was considering changing its name and corporate objectives and engaging in a new project based in the Toronto area. At no time has WAMY advised the CRA how it has implemented any of these new activities or objectives.

Consequently, we are unable to conclude with any degree of certainty that WAMY has limited itself to the pursuit of charitable purposes and activities.

## Relationship between WAMY & WAMY (Saudi Arabia)

On the basis of the information we have examined, it is our view that, on a balance of probabilities, it is logical and reasonable to assume that WAMY was established to support the goals and operations of the parent organization WAMY (Saudi Arabia), and as a result, the objects and activities of WAMY cannot be viewed in isolation from those of WAMY (Saudi Arabia).

---

[8] As referenced in audit working paper 1000-7

Our review of the documentation obtained during the audit indicates that WAMY (Saudi Arabia) maintains substantial control over WAMY's finances, and uses this control to carry out its own objectives in Canada. Outlined below are a few examples of this control:

- WAMY (Saudi Arabia) provides substantially all of WAMY's operational funds;[9]
- WAMY representatives advised the CRA during the audit that WAMY (Saudi Arabia) exercised a significant amount of control over their expenses;[10]
- WAMY provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts that it disburses to these organizations. The reason provided to our auditor was that the WAMY (Saudi Arabia) wanted to know what it was responsible for supporting.[11]

While it appears that WAMY is able to use its operational funding to provide financial support for smaller events, information provided to the Directorate during the audit interview suggests that for larger events WAMY must submit separate funding applications to WAMY (Saudi Arabia)'s North American Committee. This information indicates that it is the North American Committee, rather than WAMY, that makes final decisions on project funding, as the North American Committee possesses the authority to: a) approve funding for the project, b) provide partial funding to the project, or c) deny the application. As part of this application process WAMY is also required to provide WAMY (Saudi Arabia) with information on the organizations that have applied for funding.

Our analysis of WAMY (Saudi Arabia)[12] and WAMY United Kingdom (UK)[13] statements of purpose also indicates that the objectives of these two organizations are very similar to the objectives outlined in the literature distributed by WAMY.[14]

---

[9] Several of WAMY's Form T3010s indicate that a substantial amount of WAMY's funding comes from WAMY (Saudi Arabia). Further, from the financial statements and balance sheets from 2000 and 2001 it is apparent that a large portion of WAMY's funding comes from the Kingdom of Saudi Arabia, which we interpret to be WAMY (Saudi Arabia). This is consistent with the information provided at the initial audit interview held on March 16 and 17, 2004.

[10] The initial audit interview was held with Mr. Mohamad Khatib and Mr. Talhal Al-Jarad at WAMY's office in Toronto on March 16 and 17, 2004.

[11] Initial audit interview – March 16, 2004

[12] WAMY (Saudi Arabia)'s objectives are as follows:
   a) to preserve the identity of Muslim youth and to help them overcome the problems they face in modern society;
   b) to educate and train them in order to become active an[d] positive citizens in their countries;
   c) to introduce Islam to non-Muslims in its purest form as a comprehensive system and way of life;
   d) to assist Muslim organizations all over the world through training, communication and cooperation; and
   e) establish a relationship of dialogue, understanding, and coordination between Muslim organizations, the western societies, and beyond.
   See www.infoyouth.org/cd_rmed/English/menugo/wamy.htm, last accessed March 19, 2007

[13] WAMY (UK)'s objectives are to:
   a) preserve the identity of Muslim youth and help them overcome the problems they face in modern society;
   b) to educate and train them in order for them to become active and positive citizens in their countries;
   c) introduce Islam to non-Muslims in its purest form as a comprehensive system and way of life;
   d) establish a relationship of dialogue, understanding and appreciation between Muslim organizations and the western societies; and
   e) provide assistance to Muslim and non-Muslim organizations to fulfil these goals through training and cooperation.
   See www.wamy.co.uk/hd_about.htm, last accessed March 19, 2007.

[14] WAMY does not publish and distribute its own literature. Instead it distributes materials it receives from WAMY (Saudi Arabia) and other WAMY affiliates.

'WAMY has made no attempt to distinguish itself from·WAMY (Saudi Arabia). WAMY's position relative to WAMY (Saudi Arabia) appears to be consistent with that of other WAMY affiliates around the globe, as information available on the WAMY (Saudi Arabia) website, and the websites of the WAMY offices in the United Kingdom [WAMY (UK)], and Australia [WAMY (Australia)], clearly indicate that WAMY (Saudi Arabia) is the central governing body of the organization.[15] WAMY's connection to and control by WAMY (Saudi Arabia) is particularly concerning given that publicly available information, outlined below in section 2.2, indicates that WAMY (Saudi Arabia) and its affiliates have been alleged to support terrorism.

The audit findings did not reveal any apparent separation between the activities of WAMY (Saudi Arabia) and WAMY, with all related financial and operating positions being made by WAMY (Saudi Arabia). This leads to a reasonable inference that WAMY has little or no independent function; therefore it cannot be concluded that it is carrying out its own charitable activities for which it was registered. Furthering the goals of its parent organization may not be, in fact and law, charitable in Canada. CRA's audit findings concluded that funds administered by WAMY were used for non-charitable purposes which included money transfers to non-qualified donees.

## 2.2    Activities Contrary to Public Policy - Links to Terrorism

It is well established at law that purposes which offend public policy are not charitable. [16] Canada's public policy recognizes that depriving terrorist organizations of access to funds is a fundamental tool in undermining terrorist activities as it weakens their supporting logistical and social infrastructures.[17] In this regard, it is very clear that Canada's ·commitment to combating terrorism extends to preventing organizations with ties to terrorism from benefiting from the tax advantages of charitable registration.

The *United Nations Al-Qaida and Taliban Regulations* were made on November 10, 1999 under the *United Nations Act*, pursuant to United Nations Security Council Resolution 1267. .Article 4 of those regulations effectively requires the freezing by

---

[15] A translation of Article II of WAMY (Saudi Arabia)'s governing statute indicates that WAMY's global headquarters are to be in Riyadh, Saudi Arabia, and that the organization will open branch offices around the world (see www.wamy.org/aboutus/bylaw.asp - accessed March 19, 2007). Furthermore, www.wamy.co.uk/hj_publications.htm states that all WAMY publications "...can be ordered from WAMY's Headoffice in Riyadh…", while www.wamy.org.au/index.php indicates that "WAMY, the main organization, was founded in 1973 in Riyadh, Saudi Arabia. Since then it has to be a major international Muslim organization embracing over 400 Muslim youth, student and Community organizations in five continents."

[16] See *Everywomen's Health Centre Society (1988)* v. *(Minister of National Revenue)* [1992] 2 F.C 52 and *Canadian Magen David Adom for Israel* v. *Canada (Minister of Revenue)* 2002 FCA 323

[17] See Backgrounder: Terrorist Financing, Government of Canada's Air·India Inquiry Action Plan in Response to the Commission of Inquiry into the Investigation of the Bombing of Air India Flight 182.
http://www.publicsafety.gc.ca/media/nr/2010/nr2010207-3-eng.aspx

persons in Canada and Canadians outside of Canada of the assets of the Taliban, as designated by the United Nations Security Council Committee concerning Afghanistan. The Regulations were amended on February 22, 2001 to implement Resolution 1333 and freeze the assets of Osama bin Laden or his associates, as designated by the Committee.

Canada has implemented the binding elements of Resolution 1373 of the United Nations Security Council and has ratified the United Nations *International Convention for the Suppression of the Financing of Terrorism.* The preamble to the Convention recalls General Assembly Resolution 51/210, which calls upon all States:

> 3 (d) To investigate, when sufficient justification exists according to national laws, and acting within their jurisdiction...the abuse of organizations, groups or associations, including those with charitable, social or cultural goals, by terrorists who use them as a cover for their own activities; and 3 (f) to take steps to prevent, and counteract, through appropriate domestic measures, the financing of terrorists and terrorist organizations, whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals...

The *Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism* (RIUNRST)[18], made in 2001 under the *United Nations Act,* and amendments to the *Criminal Code* made under the *Anti Terrorism Act* (ATA),[19] represent Canada's implementation of Resolution 1373. The RIUNRST creates a Canadian list of terrorist individuals and entities, provides for an assets freeze of those listed, and makes it illegal to raise funds on their behalf. The *Criminal Code* provides a process to list and apply appropriate criminal measures to entities listed as terrorists (or associated to terrorism).

Canada's commitment to combating terrorism is also reflected in its membership in the Financial Action Task Force (FATF).[20] The FATF is an intergovernmental policy making body, comprised of over 30 countries, that has a ministerial mandate to establish international standards for combating money laundering and terrorist financing. Over 180 jurisdictions have joined the FATF or an FATF-style regional body, and committed at the ministerial level to implementing the FATF standards and having their anti-money laundering (AML)/counter-terrorist financing (CTF) systems assessed. The FATF has adopted nine recommendations on combating the financing of terrorism, including Special Recommendation VIII which states that countries should take measures to ensure that charities cannot be misused:

[18] October 2, 2001
[19] December 18, 2001
[20] "What is the FATF?" www.fatf-gafi.org/documents/57/0,3343,en_32250379_32235720_34432121_1_1_1_1,00.html accessed on December 9, 2010.

- by terrorist organizations posing at legitimate entities;
- to exploit legitimate entities as conduits for terrorist financing, including for the purpose of escaping asset freezing measures; and
- to conceal or obscure the clandestine diversion of funds intended for legitimate purposes to terrorist organizations.

However, the clearest expression of Canada's public policy in this regard is found in the *Charities Registration (Security Information) Act*, which was enacted to "demonstrate Canada's commitment to participating in concerted international efforts to deny support to those who engage in terrorist activities, to protect the integrity of the registration system for charities under the *Income Tax Act* and to maintain the confidence of Canadian taxpayers that the benefits of charitable registration are made available only to organizations that operate exclusively for charitable purposes".[21]

Many of the policy and guidance statements for charities published on the CRA website call attention to the need to observe Canada's laws and public policy in this regard. For example, our publication entitled "CRA Guidance- Activities Outside of Canada" warns:

Charities have to remember their obligations under Canada's anti-terrorism legislation. As with all individuals and organizations in Canada, charities are responsible for making sure that they do not operate in association with individuals or groups that are engaged in terrorist activities, or that support terrorist activities.[22]

### Adverse Reporting on WAMY and its Affiliates

WAMY (Saudi Arabia)'s apparent control over the projects and activities to which WAMY allocates its resources is of concern to us in light of the allegations that WAMY (Saudi Arabia), along with other WAMY branches, presumably with the approval of WAMY (Saudi Arabia), have provided support to terrorist organizations. A sample of the adverse reporting is outlined below.

- The July 29, 2006, edition of the *Indian Express* reported that WAMY (Saudi Arabia) has been providing funding to the Students Islamic Movement of India (SIMI), an organization that has been banned by the Indian Government for its anti-government activities.[23] We note that SIMI's Secretary-General, Mr. Safiar Nagori, who has been identified in media reports as an important figure in the global *jihadist* movement, was arrested in connection with July 11, 2006, bombings in Mumbai, India;[24] SIMI is also believed to have links to *Lashkar-e-*

[21] *Charities Registration (Security Information) Act*, Section 2 (Purpose and Principles)
[22] CRA Guidance – Canadian Registered Charities Currying Out Activities Outside of Canada
[23] Staff Writer (2006) Government says SIMI Thrived, Spread, Despite Ban *Indian Express* July 29, 2006
Staff Writer (2006) Intelligence to Counter Terror *The Statesman (India)* September 1, 2006
[24] Sharan, Abhishek (2008) 11/7 Brain, Friend of a Jlamas Top Gun *Hindustan Times* March 28, 2008

   *Tayyiba*,[25] *Laskhar-e-Tayyiba* (LeT) was listed as terrorist entity pursuant to s. 83.05 of the *Criminal Code (Canada)* on July 18, 2003.[26]

- A report in the October 2005 issue of the Jamestown Foundation's *Terrorism Monitor*[27] alleges that WAMY (Saudi Arabia) is providing funds to Islamic militants in the Nigerian state of Yobe through a British organization affiliated with WAMY (Saudi Arabia), the Muslim World League (MWL), and the International Islamic Relief Organization (IIRO). On November 9, 2006 the United Nations Security Council approved the addition of the IIRO Indonesia branch office (a.k.a., The Human Relief Committee of the Muslim World League) to the list of entities belonging to or associated with the Al-Qaida organization.[28] The Philippine and Indonesian branch offices of the IIRO, a.k.a., The Human Relief Committee of the Muslim World League have been closed for ties to terrorist financing.[29]

- The April 12, 2002, edition of the *Arab News* reported that WAMY (Saudi Arabia) was increasing its monthly contribution to the Palestinian *intifada* to $2.7 million (USD). This increase was in addition to another $70 million (USD) that had been collected through WAMY offices abroad;[30]

- Jamaluddin B. Hoffman's report, Guide to Wahhabi Organizations in North America, identifies WAMY as the sister organization to the MWL, which he categorizes as "...*the most important and influential Wahhabi organization in the world, effectively serving as the ideological headquarters for Islamic extremists worldwide. The MWL conducts its work through branch offices and affiliate organizations established in countries all over the world... Many of those groups have direct links to the al-Qaeda terrorist network and other terrorist*

---

[25] The Hudson Institute. "Mumbai Blasts, Once Again", by Aparna Pande July 13, 2011

[26] www.publicsafety.gc.ca

[27] Shwartz, Steven (2005) Islamic Extremism on the Rise in Nigeria *Terrorism Monitor 3(20)*

- Founded in 1984, the Jamestown Foundation is a US based policy think-tank that specializes in the analysis of events and trends in countries and societies that are of strategic or tactical importance to the US and which routinely restrict access to such information. It is a public charity recognized under sections 501(c)(3) and 509(a)(1)(2) of the US Internal Revenue Code.

[28] The United Nations Security Council 1267 Committee maintains a list of individuals and entities belonging to or related to the Taliban, Usama Bin Laden and the Al-Qaida organization on their website (http://www.un.org/Docs/sc/committees/1267/1267ListEng.htm).

[29] The listing of the Philippine and Indonesian branch offices of the IIRO can be found on the following websites:

- The Office of the Superintendent of Financial Institutions Canada web site http://www.osfi-bsif.gc.ca contains the consolidated list of names subject to the regulations establishing a list of entities made under subsection 83.05(1) of the *Canadian Criminal Code* or the *United Nations Suppression of Terrorism Regulations.*

- The United Nations Security Council 1267 Committee website (http://www.un.org/Docs/sc/committees/1267/1267ListEng.htm) contains a list of individuals and entities belonging to or related to the Taliban, Usama Bin Laden and the Al-Qaida organization.

[30] Hassan, Javid (2002) WAMY to raise monthly contributions to Palestinian Intifada to SR10 million *Arab News* April 12, 2002.

*organizations.*"[31] Hoffman also describes WAMY (Saudi Arabia) as "...*the youth [wing] of the transnational extremist movement...".*

- A BBC Worldwide Monitoring Report, dated November 23, 2006, indicates that the Egyptian Government refused to issue an entry visa to Qazi Hussain Ahmad, chief of the Jamaat-i-Islami; Mr. Ahmad had been invited by WAMY (Saudi Arabia) to its 10th Annual General Convention.[32] Jamaat-i-Islami is a Pakistani based political party founded by Syed Abul Ala Maududi. The Jamaat-i-Islami's militant wing Hizbul Mujahideen is a listed entity in the European Union.[33]

  According to the Hudson Institute, Jamaat-i-Islami provided funds and military training to various Islamist liberation movements from places such as Chechnya and Bosnia.[34] During the Soviet occupation of Afghanistan, Jamaat-i-Islami provided direct support to the Afghan *mujahideen* based in Pakistan. It also hosted many of the Arab *mujahideen* who had come to participate in the insurgency.[35] During the Soviet occupation of Afghanistan, JI also maintained close links to Gulbeddin Hikmatyar's Hizbe Islami, a listed terrorist entity in Canada.[36]

- Testimony by terrorism consultants and analysts Matthew Epstein[37] and Evan Kohlmann[38] before the United States Senate Committee alleges that WAMY supports terrorism:[39]

---

[31] Hoffman, Jamaluddin B. Guide to Wahhabi Organizations in North America. available at http://cpi-mi.org/WahhabiOrganizationsNorthAmerica.pdf (accessed September 19, 2006)
- Mr. Hoffman is associated with the Islamic Supreme Council of America (ISCA). According to ISCA's website they are a non-profit, non-governmental religious organization dedicated to providing practical solutions for American Muslims based on the traditional Islamic rulings of an international advisory board (http://islamicsupremecouncil.org).

[32] *BBC Monitoring South Asia* (2006) Egyptian Government Refuses to issue visa to Qazi Hussain Ahmad *Jang* November 22, 2006.

[33] Official Journal of the European Union, 2006-03-21, "*Council Common Position 2006/231/CFSP of 20 March 2006*" [7202-2-62]

McCants, William, editor (2006) *Militant Ideology Atlas* West Point, NY: U.S. Military Academy, Combating Terrorism Center, pg. 229 - 233
- The Militant Ideology Atlas is the result of a comprehensive study of the literature produced by those intellectuals whose works have provided the theological and ideological underpinning for the global *jihadist* movement. The Atlas is available online at www.ctc.usma.edu/atlas/default.asp.

[34] The Hudson Institute. "Ideologies of South Asian Jihadi Groups", Published by Husain Haqqani, 2005-05-19
[35] Ibid
[36] Ibid and www.publicsafety.gc.ca

[37] Matthew Epstein is a terrorism analyst and attorney specializing in terrorism financing. He is also the Assistant Director of the Investigative Project, an independent research project on Islamic and Middle Eastern terrorist and militant groups.
[38] Evan Kohlmann is an international terrorism consultant, and has served as an expert witness on Al-Qaida and Usama Bin Laden in post 9/11 federal terrorism trials held in the United States. His articles appear in various news reports, and he is frequently interviewed as a terrorist expert in the major media. He is also the author of the book Al-Onida's Jihad in Europe.
[39] *Progress Since 9/11: The Effectiveness of U.S. Anti-Terrorist Financing Efforts* - Testimony of Matthew Epstein with Evan Kohlmann, March 11, 2003, available at: http://financialservices.house.gov/media/pdf/031103mc.pdf (accessed May 11, 2007)

In approximately 1993, in conversations with former senior al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified three Muslim charities [including the World Assembly of Muslim Youth] as the primary sources of Al-Qaida financial and fundraising activity.

These three organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al Qaida personnel worldwide, and helping 'to move funds to areas where Al-Qaeda was carrying out operations.'

According to a U. S. Justice Department brief on the subject:

'[Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor and needy.'

## Connections to Benevolence International Fund and Benevolence International Foundation

Our analysis of the information gathered from the documents acquired during the audit of WAMY, along with those retrieved from open sources, and documents filed in relation to Benevolence International Fund's (BIF-Canada) application for charitable status[40] indicates that WAMY was closely associated to BIF-Canada and provided funding to the Benevolence International Foundation (BIF-USA) in the United States. The analysis that has led to the CRA's position includes:

1. BIF-Canada and WAMY shared a common director and contact information.
    a) Mr. Mohamed Khatib served as President of WAMY at the same time he served as Secretary of BIF-Canada; [41] and
    b) the mailing address on WAMY's November 1998 application for charitable registration and its 1999 annual information return is listed as ▮▮▮▮▮▮
    ▮▮▮▮▮▮ This is the same residential address as provided by WAMY's President, Mr. Mohamed Khatib. The mailing address provided to the CRA by BIF-Canada when it applied for charitable status in December 2000

[40] Paragraph 241(4)(a) of the Act allows the CRA to disclose to any person "taxpayer information that can reasonably be regarded as necessary for the purposes of the administration or enforcement of this Act."
[41] WAMY's 1999 and 2000 T3010s and BIF's T2050 submitted to CRA on December 18, 2000

status was ██████████████████████████████ and to Industry
Canada when BIF-Canada incorporated in May 25, 2000.

2. BIF-Canada and WAMY shared a Canadian bank account.
   a) WAMY's Bank of Montreal Account #████████ was opened on
   October 24, 2000 and according to the bank statement had the name "World
   Assembly of Muslim Youth". Starting with the January 2001 statement the name
   changed to "World Assembly of Muslim Youth o/a BIF". The account was
   closed on June 12, 2001, and a bank draft in the amount of $19,377.86 was issued
   to close out the account, but the final destination for this amount is unknown.
   b) The address listed on the bank account statement is ██████████████
   ████████████ the same incorporating address for BIF-Canada and also the
   former residential address of WAMY President, Mr. Mohamed Khatib.
   c) In June 2001 the address listed on WAMY/BIF's Bank of Montreal account
   statements for ████████ was 203-2465 Cawthra Rd. We note that this address is
   the last known address of BIF-Canada.[42]

3. WAMY provided funding to BIF-USA.[43]
   a) During its fiscal year ending December 31, 2001, WAMY provided $50,246 to
   the Orphan Program of BIF-USA. During the time of the funding, Mohamed
   Khatib was a board member of WAMY and Secretary of BIF-Canada.[44]
   b) BIF-Canada and BIF-USA shared a common director, Mr. Enaam Arnaout.
   Following an investigation into BIF-USA, on February 10, 2002 Mr. Enaam
   Arnaout pled guilty to racketeering charges, and admitted that the charity had
   provided financial assistance to individuals engaged in violent activities overseas.
   • According to Mr. Arnaout's Plea Agreement, he admits that BIF solicited
   donations from the public by purporting that BIF and its related overseas
   offices was a charitable organization involved solely in humanitarian work
   for the benefit of civilian populations, including refugees and orphans,
   with a small amount used for administrative purposes. Arnaout further
   admitted that he and others agreed to conceal from donors, potential
   donors, and federal and state governments that a material portion of
   the donations received by BIF based on BIF's misleading
   representations was being used to support fighters overseas. The
   support he and others agreed to provide included: boots intended for
   ultimate use by fighters in Chechnya; and boots, tents, uniforms and an

---

[42] BIF's archived website lists its address as 2465 Cawthra Rd. Suite 203
http://classic-web.archive.org/web/20010721075605/http://www.benevolence.ca.com
[43] We note that BIF-Canada's archived website states that it works in cooperation with its sister organization BIF-USA. The
website for BIF-USA also lists BIF-Canada as its Canadian office http://www.benevolence.org/aboutus (Accessed 2001-07-
09)
[44] WAMY's 2001 T3010 and the incorporating documents/T2050 of BIF .

ambulance intended for ultimate use by soldiers in Bosnia-Herzegovina".[45]

c) An article in the December 5, 1992, New York Times,[46] identifies BIF-USA's founder, Adel A. Batterjee,[47] as the then-Chairman of WAMY (Saudi Arabia).[48] This same article also indicates that WAMY (Saudi Arabia) was involved in the evacuation of, and provision of health care services to, members of *mujahideen* that were wounded during the conflict in the Balkans in the early to mid 1990's.

On November 21, 2002, the Benevolence International Fund in Canada (BIF-Canada) and its related entities Benevolence International Foundation in the United States and Bosanska Idealna Futura in Bosnia were added to the Consolidated List of the United Nations Security Council's Al-Qaida and Taliban Sanctions Committee, established pursuant to the United Nations Security Council Resolution 1267, as entities belonging to, or associated with, Al-Qaeda.[49]

The above findings indicate that, contrary to Canadian public policy, WAMY maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities.

## 2.3 Gifting to Non-Qualified Donees/Lack of Direction and Control Over Resources

A registered charity is not permitted to make gifts to non-qualified donees.[50] Subsection 149.1(1) of the Act requires that a charitable organization devote all of its resources to "charitable activities carried on by the organization itself." Subsection 149.1(6)

---

[45] See United States of America v. Arnaout, United States District Court Northern District of Illinois, Eastern Division, Case 1:02 cr-008892, Document 178, filed 2003-02-10. See also Plea Agreement; United States of America vs. Enaam M. Arnaout and United States Court of Appeals.

[46] Hedges, Chris (1992). Muslims from afar joining 'Holy War' in Bosnia *New York Times* December 5, 1992

[47] Note that on December 24, 2004, Mr. Batterjee was added to the Consolidated List of the United Nations Security Council's Al-Qaida and Taliban Sanctions Committee, established pursuant to UN Security Council Resolution 1267, as an individual belonging to, or associated with, Al-Qaeda.

[48] BIF appears to have been established by Mr. Batterjee as an affiliate of WAMY (Saudi Arabia), and the two organizations appear to have operated out of the same address in Peshawar, Pakistan. Please see Working Paper 2006/7, *The Role of Islamic Charities in International Terrorist Recruitment and Financing* published by the Danish Institute of International Studies, and available at www.diis.dk/sw47287.asp.

[49] The Office of the Superintendent of Financial Institutions Canada web site http://www.osfi-bsif.gc.ca contains the consolidated list of names subject to the regulations establishing a list of entities made under subsection 83.05(1) of the *Canadian Criminal Code* or the *United Nations Suppression of Terrorism Regulations*. The United Nations Security Council 1267 Committee website (http://www.un.org/Docs/sc/committees/1267/1267ListEng.htm) contains a list of individuals and entities belonging to or related to the Taliban, Usama Bin Laden and the Al-Qaida organization.

[50] The term qualified donee is defined in subsection 149.1(1) of the Act to mean an organization to which Canadian taxpayers may directly make charitable gifts, or gifts to the Crown, which can be claimed when filing their income tax returns. Within Canada, the term *"qualified donee"* generally refers to other Canadian registered charities and municipalities. Outside Canada, the only organizations that are qualified donees under the Act are the United Nations and its agencies, certain universities outside Canada ordinarily attended by Canadian students, and charitable organizations outside Canada to which Her Majesty in Right of Canada has made a gift within the previous two years.

provides that a charitable organization shall be considered to be devoting its resources to charitable activities carried on by it to the extent that in any taxation year it disburses not more than 50% of its income for that year to qualified donees.

Except where a charity gifts its funds to a qualified donee, the CRA requires it to show that it effectively directs and actually controls its own activities on an ongoing basis, including situations in which a charity carries out its activities through an intermediary such as an agent.[51] The Federal Court of Appeal has confirmed that a charity working with an intermediary must have control over the activities carried out on its behalf, and over the use of its resources.[52] When a registered charity merely transfers its resources to another entity that is not a qualified donee, and fails to maintain effective direction and actual control over those resources, the charity has, in effect, made a gift to a non-qualified donee. This contravenes the charitable registration provisions of the Act.

As outlined in section 2.1 above, WAMY was granted registration on the understanding that it would not provide funding to non-qualified donees "for projects merely on the basis that an individual or organization receiving the charity's funds will devote those resources that are *bona fide* and in line with the charity's own objectives".[53] The audit findings reveal that WAMY has gifted to non-qualified donees despite the CRA's previous warning. The various transactions to non-qualified donees are outlined below:

- 2000 - $16,391 to the **Muslim Community of Downtown Toronto**.[54]
        - $4,959 to the *"Orphants Program"* [sic]. It is unclear which organization these funds were gifted to.

- 2001 - $50,246 to the **Benevolence International Fund** Orphan Program.[55]
        - $4,000 to the **Muslim Student Association**.

- 2002 - $2,350 to the **Shabab Islamic Centre** in Hamilton, ON. This transfer was omitted from the organization's amended *T3010*, although it does appear in the financial statements and bank records for the 2002 fiscal year.

- 2003 - $750 to the **Maritime Islamic Academy**.

        $11,000 to the **United Muslim Student Association (UMSA)** for a summer camp. This gift is not recorded in the 2003 *T3010*, although the *T3010* does indicate a gift of $11,000 to the **Al Taqua Islamic**

---

[51] CRA Publication entitled "Canadian Registered Charities Carrying Out Activities Outside of Canada".
[52] *The Canadian Committee for the Tel Aviv Foundation v. Canada* (2002 FCA 72), 2002-03-01, *Canadian Mogen David Adom for Israel v. Canada (Minister of National Revenue)* (2002 FCA 323), 2002-09-13, and *Bayit Lepletot v. Canada (Minister of National Revenue)* (2006 FCA 128), 2006-03-28
[53] Notification of Registration letter to WAMY dated 2000-02-28.
[54] The Muslim Community of Downtown Toronto was not a registered charity (BN 88253775 RR 0001) until January 1, 2008.
[55] See section 2.2 for details.

School, in London, ON. However, the charitable registration number provided by WAMY for the Al Taqua Islamic School in its 2003 73010 is the registration number for the Ottawa based Muslim Association of Canada. The Al Taqua Islamic School does not appear to be a registered charity, nor does it appear to be affiliated with the Muslim Association of Canada.

During the audit interview, Mr. Al-Jarad, then-President of WAMY, stated that most of the work that it does with other groups is financially based. He indicated that organizations apply to WAMY for project funding, and, in return the recipient organizations display WAMY signs, banners, and logos at the event for which they received funds. Mr. Al-Jarad also indicated that all of these sponsorship arrangements are done verbally.

In situations where registered charities conduct programs in cooperation with organizations that are not otherwise qualified donees it must be able to demonstrate that it arranged for the conduct of exclusively charitable activities on its own behalf, and did not simply make an outright gift to a non-qualified donee. The registered charitable organization must also be able to demonstrate to our satisfaction that it maintained, at all times, control and full accountability over the use of its resources.

We are not satisfied that WAMY has met these requirements. The lack of any documentation to support any of the verbal agreements to provide funding, together with the absence of key books and records as outlined in section 1.0, makes it impossible for the CRA to determine whether WAMY's provision of funding to these organizations constitutes its own, exclusively charitable, activity.

Audit findings also indicate that WAMY and its directors failed to demonstrate adequate internal control measures. In order to ensure proper and adequate accountability within an organization, it is imperative to have acceptable internal controls in place.[56] Audit findings revealed that:
- Mr. Talhah Al-Jarad, who resigned his position as President of WAMY in October 2003, was still listed as an authorized official on WAMY's bank accounts in March 2004, and continued to authorize cheques for some months after his resignation; and
- WAMY requires only one official to authorize cheques; and Mr. Al-Jarad was unable to provide the CRA with any information regarding WAMY's receipting procedures, or any events that may have occurred before his tenure as President.

Our review of WAMY's bank account statements revealed that WAMY allowed BIF-Canada to maintain control over its Bank of Montreal account██████ from January 2001 to June 2001 (at which time the account was closed) and to use the funds in this bank account

[56] In accordance with Section 5200 of the *Canadian Institute of Chartered Accountants (CICA) Handbook*, internal control comprises the plan of the organization and all the co-ordinate systems established by management to assist in achieving management's objective of ensuring, as far as practical, the orderly and efficient conduct of its business, including the safeguarding of assets, the reliability of accounting records and the timely preparation of reliable financial information.

at its discretion. During this time period Mr. Khatib was a common director of both WAMY and BIF-Canada.[57]

Due to the fact that WAMY allowed another organization to use its bank account we are unable to conclude with any degree of certainty that any of the transactions conducted during this time period were carried out as part of the activities of WAMY. Cheques totalling $60,698.17 drawn on the Bank of Montreal Account # ▉▉▉▉ which was closed on June 12, 2001, were not identified during the audit and we were unable to determine the recipient of these funds.

## 2.4    Lack of Public Benefit / Promotion of Intolerance

The issue of public benefit is at the heart of every inquiry into an organization's claim to charitable status under the Act. Under the current legislative and common law règime, an organization can only be considered charitable if it meets the definition of charity at common law. Part of that definition requires that in order for an organization to be considered charitable it must be established for public benefit. The requirement of public benefit involves the application of a two-part test. The first part of the test generally requires that a tangible benefit be conferred, directly, or indirectly. The requirement that the benefit be tangible stems from the need to have a benefit that is recognizable, capable of being proven.[58] More recently, and in the Canadian context, this requirement has also been described as an "...objectively measurable and socially useful benefit."[59] The second part of the test requires the benefit to have a public character, that is, to be directed to the public or a sufficient section of the public. Further details concerning the requirements of the public benefit test are laid out in comprehensive detail in the CRA publication, "*Guidelines for Registering a Charity: Meeting the Public Benefit Test*".[60]

As outlined below our analysis of the information gathered from the documents acquired during the audit of WAMY, along with those retrieved from open sources found that the literature distributed by WAMY and other material produced by WAMY (Saudi Arabia), in our view, appears to promote intolerance of, and/or advocate violence against,

---

[57] WAMY's 1999 T3010 and the incorporating documents for WAMY and BIF.

[58] See generally, *Gilmour v. Coats et al*, [1949] 1 All E.R. 848. An intangible public benefit that is regarded as valuable or "approved" by "the common understanding of enlightened opinion for the time being" may be acceptable in certain circumstances. The UK courts have accepted that an intangible benefit approved by "the common understanding of enlightened opinion for the time being" can potentially be charitable under the fourth head. See, for example, *National Anti-Vivisection Society v. I.R.C.*, [1947] 2 All ER 217 (HL) per Lord Wright at p. 224. The Charity Commission for England and Wales has interpreted this test to mean, "a common consensus of opinion amongst people who are fair-minded and free from prejudice or bias." See Decision of the Charity Commissioners for England and Wales (17 November 1999) Application for Registration as a Charity by the Church of Scientology (England and Wales) at p.38 and p. 45 and Decision of the Charity Commission for England and Wales (August 15, 2000), Application for Registration of National Federation of Spiritual Healers (NFSH) Charitable Trust Limited, at paragraph 7.3. Courts in Canada have taken a more cautious approach, noting courts to be ill-equipped to "assess public consensus, which is a fragile and volatile concept". See *Everywoman's Health Centre Society (1988) v The Queen*, 92 DTC 6001; [1992] 2 FC 52; [1991] 2 CTC 320 at pp. 68-69.

[59] See *Vancouver Society* at para 42, Conthier J.

[60] www.cra-arc.gc.ca/tax/charities/policy/cps/cps-024-e.html

non-Muslims and/or the use of violence as a means to bring about political or societal change. For example:

- The MWL pamphlet, *A Dialogue on the Internet*, distributed by WAMY (Canada), states that *"Christians living with Muslims in the east...have always enjoyed the tolerance and good treatment of Islam...[u]nfortunately Western Christians preferred and still prefer to be the enemies of Islam and Muslims."* [61] [emphasis added]

- An affidavit filed in U.S. District Court in Virginia by David Kane, a Senior Special Agent with the U.S. Department of Homeland Security, quotes excerpts from WAMY publications that appear to promote hatred and intolerance:[62]

  o a WAMY publication entitled "A Handy Encyclopaedia of Contemporary Religions and Sects"[63] states that *"[t]he Jews are humanity's enemies; they foment immorality in this world; the Jews are deceitful, they say something but mean the exact opposite."* [sic]; and

  o a 1991 WAMY (Saudi Arabia) publication entitled *"Twajihat Islamiya"* (Islamic Views) states *"[t]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and Al-Quds [Jerusalem] when they go back to Islam and make jihad for the sake of Allah."* [64]

- WAMY (Saudi Arabia) has published and distributed Mawlana Syed Abul Ala Maududi's book Towards Understanding Islam, a copy of which was obtained from WAMY (Canada) during the March 2004 audit. This book contains several paragraphs that appear to present an extremist, militant interpretation of the concept of *jihad*. In addition, Syed Maududi is also the author of Jihad for the Sake of God, a work that is considered to be one of the more influential treatises on the subject of *jihad*. Syed Maududi is also the founder of the extremist *Jamaat-e-Islami* political party, an organization that is believed to have links to the Kashmiri based militant group, *Hizbul Mujahideen*.[65]

[61] *A Dialogue on the Internet*, MWL Series on Islam No. 29, By Dr. Arafat El Ashi.

[62] Vidino, Lorenzo (2005). The Muslim Brotherhood's Conquest of Europe *Middle East Quarterly* Winter 2005 (available at www.meforum.org/article/687)

[63] Translations of excerpts from this document have been obtained from The Eagle Online, the online newsletter of the American University, whose Muslim chaplain, Fadel Soliman, was a director of WAMY (USA). After the FBI raided the WAMY (USA) office, The Eagle Online obtained copies of several works distributed by WAMY (USA) had them translated, and posted two of the translated pages on its website.

[64] Vidino (2005).

[65] For more information on Mawlana Syed Abdul Ala Maududi, please see:

- William McCants, ed. (2006) *Militant Ideology Atlas* West Point, NY: U.S. Military Academy, Combating Terrorism Center pgs. 10, and 229 to 233;

- Freedom House (2005) *Saudi Publications on Hate Ideology Invade American Mosques* Washington, D.C.: The Center for Religious Freedom. pg. 62

Our concerns in this regard are heightened due to the connection between WAMY and BIF-Canada and the various reports that indicate that branches of, and/or organizations closely associated with or funded by WAMY (Saudi Arabia) may have ties to terrorism. These allegations cannot be ignored in the context of the public benefit test for a registered charity.

It is our view that WAMY has not demonstrated with any degree of certainty that it operates exclusively for charitable purposes and activities in accordance with subsection 149.1(1) of the Act.

## 3. Failed to file an information return as and when required under the Act or a Regulation (Paragraph 168(1)(c) of the Act)

Pursuant to subsection 149.1(14) of the Act, every registered charity must, within six months from the end of the charity's taxation year, without notice or demand, file a Registered Charity Information Return (T3010) with the applicable schedules. The T3010 must be completed by a director, trustee or like official of the charity. By signing the return, this official certifies "...that the information given on this form, the basic information sheet and any attachments is, to the best of my knowledge, correct, complete, and current." The certification block contains the warning "It is a serious offence under the *Income Tax Act* to provide false or deceptive information." A charity is not meeting its requirement to file an Information Return if it fails to ensure the accuracy of the information contained in its Return.

Our review of WAMY's *T3010's* covering the period from January 1, 2000 to December 31, 2003, indicates that many items reported by the organization were incorrectly identified or omitted. Examples include:

*Fiscal Year Ending December 31, 2000*

1) At line 20 of its *T3010* for the fiscal year ending December 31, 2000, WAMY stated that it was inactive. However, other information contained in the return clearly indicates that WAMY was active during this fiscal period with total disbursements of $216,614.

2) The unaudited financial statements filed with the organization's *T3010* do not reconcile with the information contained in the *T3010*. For example:

---

Freedom House is a public charity recognized under section 501(c)(3) of the US Internal Revenue Code; it was founded by Eleanor Roosevelt and Wendell Willkie over 60 years ago.

i) at line 117, the organization reports other income of $130,210 from "WAMY / Kingdom of Saudi Arabia", yet the financial statement for the same period indicates that the organization received $127,534 from the WAMY Headquarters in Saudi Arabia;

ii) at line 125, WAMY reports a disbursement of $126,870 but was unable to offer an explanation for this expense. Furthermore, this disbursement is not recorded in the financial statements that accompany the return;

iii) the $4,959 transfer to the *"Orphans Program"*, which is detailed in the financial statement, is not recorded in the T3010.

### Fiscal Year Ending December 31, 2001

1) The unaudited financial statements filed with the organization's *T3010* do not reconcile with the information contained in the *T3010*. For example, the financial statements indicate program expenses of $189,484, *'designated donations'* of $50,246, and office expenses of $360, while the *T3010* shows program expenses of $32,580, gifts to qualified donees of $208,019, and no administrative expenses.

2) At line 631, the organization indicates it made gifts of $73,812 to qualified donees outside of Canada. This figure is substantially higher than the $50,246 gift to the Benevolence International Fund – Orphan Program detailed in Section H of the *T3010*, which appears to be the only disbursement to an organization outside of Canada.

3) At Section H, WAMY lists gifts of $208,019 to six "qualified donees". Our analysis of WAMY's bank accounts indicates that some of the financial transactions to these "qualified donees" were made from WAMY's Bank of Montreal account▆▆▆▆ which operated under the name "BIF" from January 2001 to June 2001.[66] We are unable to conclude with any degree of certainty that payments made to qualified donees from WAMY's Bank of Montreal account▆▆▆▆ were carried out as part of the activities of WAMY.

4) The donation receipts do not add up to what is reported per the T3010, ie. $32,580 in large even numbers vs the $84,465 originally reported. Donation receipts numbered 30 to 82 inclusive were missing, so this amount could not be reconciled.[67]

### Fiscal Year Ending December 31, 2002

---

[66] Audit findings confirm that payments in the amount of $21,890.56 to Dar Al Imam, $6981.76 to Huda School, $13,970.26 to IQRA Islamic School, and $7,447.66 to IICO were made from WAMY's Bank of Montreal account▆▆▆▆ during the January 2001 to June 2001 timeframe when the account was operating under the name "BIF".
[67] As referenced in audit working paper 6000-1.

1) The unaudited financial statements filed with the organization's *T3010* do not match the information contained in the *T3010*. For example, the financial statements show program expenses of $73,699 and administrative costs totaling $11,943, yet entries in the *T3010* indicate program expenses of only $66,752, gifts to qualified donees of $18,890, and no administrative expenses.

*Review of the Registered Charity Information Return(s) (T3010's) for the fiscal periods ending December 31, 2005, 2006, 2007, 2008 and 2009*

1) No financial statements were provided for the 2005, 2006, 2007 and 2009 fiscal periods.

2) All T3010's indicate "No Activity" under Section C of the T3010. However, the 2008 and 2009 T3010 under Section C, New Programs: indicates the Orphan Program and Welfare Program for Poor and Needy.

3) The 2008 financial statements indicate no assets, no liabilities, and no revenue; however, the 2008 and 2009 T3010's indicate that it has $1, 255.00 in capital assets outside of Canada.

Consequently, it is our view that WAMY has improperly certified that it has filed returns that are correct and complete and has not met the requirement of the Act to file a prescribed information return.

## 4. Conclusion

On the basis of our audit findings, it is our preliminary view that for each of the reasons above there are sufficient grounds for revocation of WAMY's registration under subsection 168(1) the Act.

## The Organization's Options:

### (a) No response

WAMY may choose not to respond to the issues raised above. In that case, the Director General of the Charities Directorate may then consider a course of action that could include the issuance of a *Notice of Intention to Revoke* the registration of WAMY in the manner described in s. 168(1) of the Act.

### (b) Response

Should WAMY choose to respond, it must do so in writing within 30 days of the date of this letter. Its response must address *each* of the concerns detailed above. After careful consideration of any representations submitted by WAMY, the Charities Directorate will

then decide on an appropriate course of action, which could include the issuance of a *Notice of Intention to Revoke* the registration of WAMY in the manner described in s. 168(1) of the Act.

If you appoint a third party to represent you in this matter, please send us a written authorization naming the individual and explicitly authorizing that individual to discuss your file with us. If you have any questions or require further information or clarification, please do not hesitate to contact us at ▮▮▮▮▮▮▮▮

Senior Audit Advisor
Charities Directorate
Canada Revenue Agency
320 Queen Street
Ottawa ON K1A 0L5

## APPENDIX A

### Relevant Provisions of the Act

### Section 149.1: [Charities]

### 149.1(2) Revocation of registration of charitable organization

The Minister may, in the manner described in section 168, revoke the registration of a charitable organization for any reason described in subsection 168(1) or where the organization

(a) carries on a business that is not a related business of that charity; or

(b) fails to expend in any taxation year, on charitable activities carried on by it and by way of gifts made by it to qualified donees, amounts the total of which is at least equal to the organization's disbursement quota for that year.

### 149.1(3) Revocation of registration of public foundation

The Minister may, in the manner described in section 168, revoke the registration of a public foundation for any reason described in subsection 168(1) or where the foundation

(a) carries on a business that is not a related business of that charity;

(b) fails to expend in any taxation year, on charitable activities carried on by it and by way of gifts made by it to qualified donees, amounts the total of which is at least equal to the foundation's disbursement quota for that year;

(c) since June 1, 1950, acquired control of any corporation;

(d) since June 1, 1950, incurred debts, other than debts for current operating expenses, debts incurred in connection with the purchase and sale of investments and debts incurred in the course of administering charitable activities; or

(e) at any time within the 24 month period preceding the day on which notice is given to the foundation by the minister pursuant to subsection 168(1) and at a time when the foundation was a private foundation, took any action or failed to expend amounts such that the Minister was entitled, pursuant to subsection (4), to revoke its registration as a private foundation.

### 149.1(4) Revocation of registration of private foundation

The Minister may, in the manner described in section 168, revoke the registration of a private foundation for any reason described in subsection 168(1) or where the foundation

(a) carries on any business;

(b) fails to expend in any taxation year, on charitable activities carried on by it and by way of gifts made by it to qualified donees, amounts the total of which is at least equal to the foundation's disbursement quota for that year;

(c) since June 1, 1950, acquired control of any corporation; or

(d) since June 1, 1950, incurred debts, other than debts for current operating expenses, debts incurred in connection with the purchase and sale of investments and debts incurred in the course of administering charitable activities.

A-1/9

### 149.1(4.1) Revocation of registration of registered charity

The Minister may, in the manner described in section 168, revoke the registration

- (a) of a registered charity, if the registered charity has made a gift to another registered charity and it can reasonably be considered that one of the main purposes of making the gift was to unduly delay the expenditure of amounts on charitable activities;
- (b) of the other charity referred to in paragraph (a), if it can reasonably be considered that, by accepting the gift, it acted in concert with the registered charity to which paragraph (a) applies; and
- (c) of a registered charity, if a false statement, within the meaning assigned by subsection 163.2(1), was made in circumstances amounting to culpable conduct, within the meaning assigned by that subsection, in the furnishing of information for the purpose of obtaining registration of the charity.

### Section 168: Notice of intention to revoke registration

168(1) Where a registered charity or a registered Canadian amateur athletic association

- (a) applies to the Minister in writing for revocation of its registration,
- (b) ceases to comply with the requirements of this Act for its registration as such,
- (c) fails to file an information return as and when required under this Act or a regulation,
- (d) issues a receipt for a gift or donation otherwise than in accordance with this Act and the regulations or that contains false information,
- (e) fails to comply with or contravenes any of sections 230 to 231.5, or
- (f) in the case of a registered Canadian amateur athletic association, accepts a gift or donation the granting of which was expressly or impliedly conditional on the association making a gift or donation to another person, club, society or association,

the Minister may, by registered mail, give notice to the registered charity or registered Canadian amateur athletic association that the Minister proposes to revoke its registration.

### 168(2) Revocation of Registration

Where the Minister gives notice under subsection (1) to a registered charity or to a registered Canadian amateur athletic association,

- (a) if the charity or association has applied to the Minister in writing for the revocation of its registration, the Minister shall, forthwith after the mailing of the notice, publish a copy of the notice in the *Canada Gazette*, and
- (b) in any other case, the Minister may, after the expiration of 30 days from the day of mailing of the notice, or after the expiration of such extended period from the day of mailing of the notice as the Federal Court of Appeal or a judge of that Court, on application made at any time before the determination of any appeal pursuant to subsection 172(3) from the giving of the notice, may fix or allow, publish a copy of the notice in the *Canada Gazette*,

and on that publication of a copy of the notice, the registration of the charity or association is revoked.

**168(4) Objection to proposal or designation**

A person that is or was registered as a registered charity or is an applicant for registration as a registered charity that objects to a notice under subsection (1) or any of subsections 149.1(2) to (4.1), (6.3), (22) and (23) may, on or before the day that is 90 days after the day on which the notice was mailed, serve on the Minister a written notice of objection in the manner authorized by the Minister, setting out the reasons for the objection and all the relevant facts, and the provisions of subsections 165(1), (1.1) and (3) to (7) and sections 166, 166.1 and 166.2 apply, with any modifications that the circumstances require, as if the notice were a notice of assessment made under section 152.

**Section 172: Appeal from refusal to register, revocation of registration, etc.**
**172(3) Appeal from refusal to register, revocation of registration, etc.**
Where the Minister

(a) refuses to register an applicant for registration as a Canadian amateur athletic association,

(a.1) confirms a proposal, decision or designation in respect of which a notice was issued by the Minister to a person that is or was registered as a registered charity, or is an applicant for registration as a registered charity, under any of subsections 149.1(2) to (4.1), (6.3), (22) and (23) and 168(1), or does not confirm or vacate that proposal, decision or designation within 90 days after service of a notice of objection by the person under subsection 168(4) in respect of that proposal, decision or designation,

(b) refuses to accept for registration for the purposes of this Act any retirement savings plan,

(c) refuses to accept for registration for the purposes of this Act any profit sharing plan or revokes the registration of such a plan,

(d) refuses to issue a certificate of exemption under subsection 212(14),

(e) refuses to accept for registration for the purposes of this Act an education savings plan,

(e.1) sends notice under subsection 146.1(12.1) to a promoter that the Minister proposes to revoke the registration of an education savings plan,

(f) refuses to register for the purposes of this Act any pension plan or gives notice under subsection 147.1(11) to the administrator of a registered pension plan that the Minister proposes to revoke its registration,

(f.1) refuses to accept an amendment to a registered pension plan, or

(g) refuses to accept for registration for the purposes of this Act any retirement income fund, the applicant or the organization, foundation, association or registered charity, as the case may be, in a case described in paragraph (a) or (a.1), the applicant in a case described in paragraph (b), (d), (e) or (g), a trustee under the plan or an employer of employees who are beneficiaries under the plan, in a case described in paragraph (c), the promoter in a case described in paragraph (e.1), or the administrator of the plan or an employer who participates in the plan, in a case described in paragraph (f) or (f.1), may appeal from the Minister's decision, or from the giving of the notice by the Minister, to the Federal Court of Appeal.

**Section 180: Appeals to Federal Court of Appeal**
**180(1) Appeals to Federal Court of Appeal**
An appeal to the Federal Court of Appeal pursuant to subsection 172(3) may be instituted by filing a notice of appeal in the Court within 30 days from

(a) the day on which the Minister notifies a person under subsection 165(3) of the Minister's action in respect of a notice of objection filed under subsection 168(4),

(b) the mailing of notice to a registered Canadian amateur athletic association under subsection 168(1),

(c) the mailing of notice to the administrator of the registered pension plan under subsection 147.1(11),

(c.1) the sending of a notice to a promoter of a registered education savings plan under subsection 146.1(12.1), or

(c) the time the decision of the Minister to refuse the application for acceptance of the amendment to the registered pension plan was mailed, or otherwise communicated in writing, by the Minister to any person,

as the case may be, or within such further time as the Court of Appeal or a judge thereof may, either before or after the expiration of those 30 days, fix or allow.

### Section 188: Revocation tax

#### 188(1) Deemed year-end on notice of revocation

If on a particular day the Minister issues a notice of intention to revoke the registration of a taxpayer as a registered charity under any of subsections 149.1(2) to (4.1) and 168(1) or it is determined, under subsection 7(1) of the Charities Registration (Security Information) Act, that a certificate served in respect of the charity under subsection 5(1) of that Act is reasonable on the basis of information and evidence available,

(a) the taxation year of the charity that would otherwise have included that day is deemed to end at the end of that day;

(b) a new taxation year of the charity is deemed to begin immediately after that day; and

(c) for the purpose of determining the charity's fiscal period after that day, the charity is deemed not to have established a fiscal period before that day.

#### 188(1.1) Revocation tax

A charity referred to in subsection (1) is liable to a tax, for its taxation year that is deemed to have ended, equal to the amount determined by the formula

$$A - B$$

where

A is the total of all amounts, each of which is

(a) the fair market value of a property of the charity at the end of that taxation year,

(b) the amount of an appropriation (within the meaning assigned by subsection (2) in respect of a property transferred to another person in the 120-day period that ended at the end of that taxation year, or

(d) the income of the charity for its winding-up period, including gifts received by the charity in that period from any source and any income that would be computed under section 3 as if that period were a taxation year; and

B is the total of all amounts (other than the amount of an expenditure in respect of which a deduction has been made in computing income for the winding-up period under paragraph (c) of the description of A, each of which is

(a) a debt of the charity that is outstanding at the end of that taxation year,

(b) an expenditure made by the charity during the winding-up period on charitable activities carried on by it, or

(c) an amount in respect of a property transferred by the charity during the winding-up period and not later than the latter of one year from the end of the taxation year and the day, if any, referred to in paragraph (1.2)(c) to a person that was at the time of the transfer an eligible donee in respect of the charity, equal to the amount, if any, by which the fair market value of the property, when transferred, exceeds the consideration given by the person for the transfer.

### 188(1.2) Winding-up period

In this Part, the winding-up period of a charity is the period, that begins immediately after the day on which the Minister issues a notice of intention to revoke the registration of a taxpayer as a registered charity under any of subsections 149.1(2) to (4.1) and 168(1) (or, if earlier, immediately after the day on which it is determined, under subsection 7(1) of the Charities Registration (Security Information) Act, that a certificate served in respect of the charity under subsection 5(1) of that Act is reasonable on the basis of information and evidence available), and that ends on the day that is the latest of

(a) the day, if any, on which the charity files a return under subsection 189(6.1) for the taxation year deemed by subsection (1) to have ended, but not later than the day on which the charity is required to file that return,

(b) the day on which the Minister last issues a notice of assessment of tax payable under subsection (1.1) for that taxation year by the charity, and

(c) if the charity has filed a notice of objection or appeal in respect of that assessment, the day on which the Minister may take a collection action under section 225.1 in respect of that tax payable.

### 188(1.3) Eligible donee

In this Part, an eligible donee in respect of a particular charity is a registered charity

(a) of which more than 50% of the members of the board of directors or trustees of the registered charity deal at arm's length with each member of the board of directors or trustees of the particular charity;

(b) that is not the subject of a suspension under subsection 188.2(1);

(c) that has no unpaid liabilities under this Act or under the Excise Tax Act;

(d) that has filed all information returns required by subsection 149.1(14); and

(e) that is not the subject of a certificate under subsection 5(1) of the Charities Registration (Security Information) Act or, if it is the subject of such a certificate, the certificate has been determined under subsection 7(1) of that Act not to be reasonable.

### 188(2) Shared liability — revocation tax

A person who, after the time that is 120 days before the end of the taxation year of a charity that is deemed by subsection (1) to have ended, receives property from the charity, is jointly and severally, or solidarily, liable with the charity for the tax payable under subsection (1.1) by the charity for that taxation year for an amount not exceeding the total of all appropriations, each of which is the amount by which the fair market value of such a property at the time it was so received by the person exceeds the consideration given by the person in respect of the property.

### 188(2.1) Non-application of revocation tax

Subsections (1) and (1.1) do not apply to a charity in respect of a notice of intention to revoke given under any of subsections 149.1(2) to (4.1) and 168(1) if the Minister abandons the intention and so notifies the charity or if

(a) within the one-year period that begins immediately after the taxation year of the charity otherwise deemed by subsection (1) to have ended, the Minister has registered the charity as a charitable organization, private foundation or public foundation; and

(b) the charity has, before the time that the Minister has so registered the charity,

(i) paid all amounts, each of which is an amount for which the charity is liable under this Act (other than subsection (1.1)) or the Excise Tax Act in respect of taxes, penalties and interest, and

(ii) filed all information returns required by or under this Act to be filed on or before that time.

### 188(3) Transfer of property tax

Where, as a result of a transaction or series of transactions, property owned by a registered charity that is a charitable foundation and having a net value greater than 50% of the net asset amount of the charitable foundation immediately before the transaction or series of transactions, as the case may be, is transferred before the end of a taxation year, directly or indirectly, to one or more charitable organizations and it may reasonably be considered that the main purpose of the transfer is to effect a reduction in the disbursement quota of the foundation, the foundation shall pay a tax under this Part for the year equal to the amount by which 25% of the net value of that property determined as of the day of its transfer exceeds the total of all amounts each of which is its tax payable under this subsection for a preceding taxation year in respect of the transaction or series of transactions.

### 188(3.1) Non-application of subsection (3)

Subsection (3) does not apply to a transfer that is a gift to which subsection 188.1(11) applies.

A-6/9

### 188(4) Idem

Where property has been transferred to a charitable organization in circumstances described in subsection (3) and it may reasonably be considered that the organization acted in concert with a charitable foundation for the purpose of reducing the disbursement quota of the foundation, the organization is jointly and severally liable with the foundation for the tax imposed on the foundation by that subsection in an amount not exceeding the net value of the property.

### 188(5) Definitions

In this section,

"net asset amount"

"net asset amount" of a charitable foundation at any time means the amount determined by the formula

$A - B$

where

A is the fair market value at that time of all the property owned by the foundation at that time, and

B is the total of all amounts each of which is the amount of a debt owing by or any other obligation of the foundation at that time;

"net value"

"net value" of property owned by a charitable foundation, as of the day of its transfer, means the amount determined by the formula

$A - B$

where

A is the fair market value of the property on that day, and

B is the amount of any consideration given to the foundation for the transfer.

### Section 189

### 189(6) Taxpayer to file return and pay tax

Every taxpayer who is liable to pay tax under this Part (except a charity that is liable to pay tax under section 188(1)) for a taxation year shall, on or before the day on or before which the taxpayer is, or would be if tax were payable by the taxpayer under Part I for the year, required to file a return of income or an information return under Part I for the year,

- (a) file with the Minister a return for the year in prescribed form and containing prescribed information, without notice or demand therefor;
- (b) estimate in the return the amount of tax payable by the taxpayer under this Part for the year; and
- (c) pay to the Receiver General the amount of tax payable by the taxpayer under this Part for the year.

### 189(6.1) Revoked charity to file returns

Every taxpayer who is liable to pay tax under subsection 188(1.1) for a taxation year shall, on or before the day that is one year from the end of the taxation year, and without notice or demand,
(a) file with the Minister
   (i) a return for the taxation year, in prescribed form and containing prescribed information, and
   (ii) both an information return and a public information return for the taxation year, each in the form prescribed for the purpose of subsection 149.1(14); and
(b) estimate in the return referred to in subparagraph (a)(i) the amount of tax payable by the taxpayer under subsection 188(1.1) for the taxation year; and
(c) pay to the Receiver General the amount of tax payable by the taxpayer under subsection 188(1.1) for the taxation year.

### 189 (6.2) Reduction of revocation tax liability

If the Minister has, during the one-year period beginning immediately after the end of a taxation year of a person, assessed the person in respect of the person's liability for tax under subsection 188(1.1) for that taxation year, has not after that period reassessed the tax liability of the person, and that liability exceeds $1,000, that liability is, at any particular time, reduced by the total of
(a) the amount, if any, by which
   (i) the total of all amounts, each of which is an expenditure made by the charity, on charitable activities carried on by it, before the particular time and during the period (referred to in this subsection as the "post-assessment period") that begins immediately after a notice of the latest such assessment was mailed and ends at the end of the one-year period exceeds
   (ii) the income of the charity for the post-assessment period, including gifts received by the charity in that period from any source and any income that would be computed under section 3 if that period were a taxation year, and '
(b) all amounts, each of which is an amount, in respect of a property transferred by the charity before the particular time and during the post-assessment period to a person that was at the time of the transfer an eligible donee in respect of the charity, equal to the amount, if any, by which the fair market value of the property, when transferred, exceeds the consideration given by the person for the transfer.

**189(6.3) Reduction of liability for penalties**

If the Minister has assessed a registered charity in respect of the charity's liability for penalties under section 188.1 for a taxation year, and that liability exceeds $1,000, that liability is, at any particular time, reduced by the total of all amounts, each of which is an amount, in respect of a property transferred by the charity after the day on which the Minister first assessed that liability and before the particular time to a person that was at the time of the transfer an eligible donee in respect of the charity, equal to the amount, if any, by which the fair market value of the property, when transferred, exceeds the total of

(a) the consideration given by the person for the transfer, and

(b) the part of the amount in respect of the transfer that has resulted in a reduction of an amount otherwise payable under subsection 188(1.1).

**189 (7) Minister may assess**

Without limiting the authority of the Minister to revoke the registration of a registered charity, the Minister may also at any time assess a taxpayer in respect of any amount that a taxpayer is liable to pay under this Part.

# Exhibit B

To the Plaintiffs' Executive Committees' July 24, 2019
Request for International Judicial Assistance (Letter Rogatory)



Canada Revenue     Agence du revenu
Agency             du Canada

**JAN 2 2 2016**

Mr. Omar T. Mohammedi, LLC
233 Broadway, Suite 801
Woolworth Building
New York NY 10279
USA

### SUBJECT:   World Assembly of Muslim Youth

Dear Mr. Mohammedi:

We acknowledge receipt of your letter dated September 3, 2015, submitted on behalf of
your client, World Assembly of Muslim Youth in Saudi Arabia (WAMY Saudi Arabia),
wherein you demand that the Canada Revenue Agency (CRA) retract *"any statement
from our letters dated January 5, 2012 and August 23, 2011 to Mr. Ayaman Al-Taher that
WAMY Saudi Arabia has any links to terrorism."*

As you are aware, effective January 5, 2012, the CRA revoked the charitable registration
of the World Assembly of Muslim Youth in Canada (WAMY Canada) following an audit
of WAMY Canada's books and records. The CRA letters referenced above are the
Administrative Fairness Letter (AFL) dated August 23, 2011 and the Notice of Intention
to Revoke dated January 5, 2012 which were issued to WAMY Canada as a result of our
audit.[1]

The CRA has a responsibility as a regulator to ensure that organizations which have been
granted the tax privileges of a registered charity are operating in a manner that complies
with the requirements for such registration. The provisions of the *Income Tax Act*
(the Act) dealing with the registration and revocation of charities relate solely to the tax
treatment of Canadian charities and their donors. It is important to appreciate that the
process to review an organization's continued eligibility for charitable registration does
not require the CRA to provide undisputable evidence of wrongdoing as a basis for

---

[1] The confidentiality provisions of the Act generally prohibit a government official from disclosing
taxpayer information to third parties except in expressly permitted circumstances. However, paragraph
241(3.2)(e) of the Act permits the disclosure of "a *copy of the entirety of or any part of any letter sent by or
on behalf of the Minister to the registrant relating to the grounds for the revocation or annulment*".

A copy of the AFL and Notice of Intention to Revoke issued to WAMY Canada are attached for your
reference.



1

revocation. Rather, the revocation of a charitable organization's registered status under the Act is an administrative decision.

In making an administrative decision as to whether a charity continues to qualify for registered status, we take into account, and draw reasonable inferences from, all relevant information that is generally available to the public. We review and weigh all of the information collected during the audit to determine whether the charity has demonstrated that it continues to meet the common law and statutory requirements for registration.

When the CRA concludes an audit of a registered charity and the preliminary results indicate that the organization may not be adhering to its ongoing registration requirements, the CRA will issue an AFL. The purpose of the AFL is two-fold:

1. to describe, and fully disclose to the charity the evidentiary basis for, our findings related to the identified areas of non-compliance; and
2. provide the charity with an opportunity to respond to our concerns, to make available to the CRA any additional information, and to submit written representations and any relevant documentation as to why its charitable status should not be revoked.

As confirmed by the Federal Court of Appeal in Canada, the onus is on the registered charity to demonstrate that we have erred or that the audit findings should not result in revocation.[2]

The CRA will fully consider the charity's representations, if any are made, and the Director General of the Charities Directorate will decide on the appropriate course of action. At issue is whether the evidence provided by the charity, together with information otherwise available to the CRA, satisfies us that the charity is devoting its resources to charitable activities and otherwise continues to meet the requirements for registration. If the Director General determines that our concerns were not alleviated by the response and that revocation of the charity's registration is the appropriate compliance action, the charity will be issued a Notice of Intention to Revoke by registered mail outlining the rationale for that decision.

Upon receipt of a Notice of Intention to Revoke, due process allows an organization to appeal that decision if the organization believes that the CRA may have misinterpreted the facts or applied the law incorrectly. In this regard, a charity that has had its registration revoked can file an objection with the Appeals Branch of the CRA within 90 days of the Notice of Intention to Revoke. If the CRA upholds that decision, an organization can further appeal the decision to the Federal Court of Appeal and that Court's decision can, in turn, be challenged before the Supreme Court of Canada, with that Court's permission.

---

[2] See *Public Television Association of Quebec v. Canada (National Revenue)*, 2015 FCA 170 and *Canadian Committee for the Tel Aviv Foundation v Canada* 2002 FCA 72.

We trust that the foregoing fully explains our position as it relates to your letter of
September 3, 2015.

Yours sincerely,

Cathy Hawara
Director General
Charities Directorate
Canada Revenue Agency
Place de Ville, Tower A, 5th floor
320 Queen Street
Ottawa ON  K1A 0L5



LAW FIRM OF
**OMAR T. MOHAMMEDI, LLC**

OMAR T. MOHAMMEDI, ESQ.
DIRECT DIAL: (212) 725-3846 X102
EMAIL: OMOHAMMEDI@OTMLAW.COM

233 BROADWAY, SUITE 801
WOOLWORTH BUILDING
NEW YORK, NY 10279
PHONE (212) 725-3846
FACSIMILE (212) 202-7621
WWW.OTMLAW.COM

ADMITTED: NEW YORK, EIGHTH CIRCUIT
SECOND CIRCUIT, ALGERIAN BAR
US COURT ON INTERNATIONAL TRADE

September 3, 2015

## VIA FEDEX DELIVERY

Cathy Hawara
Director General
Charities Directorate
Canada Revenue Agency
320 Queen Street
Place de Ville
13th Floor, Tower A
Ottawa, ON K1A 0L5

## Re: Allegations made by the Canada Revenue Agency against World Assembly of Muslim Youth

Dear Ms. Hawara:

As counsel for the World Assembly of Muslim Youth ("WAMY"), we write to refute and challenge the Canada Revenue Agency ("CRA") statements against our client, WAMY. While our client has no standing to challenge CRA revocation of WAMY Canada which is a separate entity from WAMY, we take issue with and seek a retraction of the false and defamatory statement that WAMY Saudi Arabia supports terrorism. WAMY has not been involved in any illegal activities let alone terrorist ones.

On January 5, 2012, the CRA revoked the registration of WAMY in Canada (registered as business number 871966040RR0001). The revocation was based on non-compliance and irregularities described in the CRA's letter dated August 23, 2011. CRA inexplicably and with no independent justification incorporated wildly inaccurate and false claims that WAMY Saudi Arabia supported terrorism.

WAMY is a charitable organization established in 1972, operating worldwide with 66 chapters, with the head office in Riyadh, Kingdom of Saudi Arabia. As stated above, we hereby demand a retraction of any statement within the letters of January 5, 2012 or August 23, 2011 to Mr. Ayman Al-Taher that WAMY Saudi Arabia has any links to terrorism. As a governmental agency, the CRA has an obligation to ascertain the facts and offer enough evidence to support its claims. The statements the CRA made are nothing more than restatements of false, defamatory and unsubstantiated statements from media sources with demonstrated bias and lack of credibility. Additionally, the CRA incorporates extensively unproven and sharply contested allegations against WAMY Saudi Arabia made by lawyers and parties with a clear and substantial monetary interest and motive.

WAMY Saudi Arabia specifically takes issue with and demands retraction of the following false and defamatory statements.

### WAMY's Alleged Support for Terrorism

Among the grounds provided in the January 5, 2012 and August 23, 2011 letters concluding to revoke WAMY Canada's charitable status, is that WAMY Canada was established to support the goals and operations of its parent organization located in Saudi Arabia, which has been alleged to support terrorism. Such statements are conclusory and provide no basis to warrant such a conclusion. (See January 5, 2012 letter at page 1 and August 23, 2011 letter at pages 5, 7, and 9-12).

The CRA's allegations and statements against WAMY are without basis. The CRA has neither shown nor cited any official information such as state/country or international designation of WAMY as a terrorist organization, or as being associated or linked to terrorism. The CRA makes further egregious allegations without any basis that WAMY and its branches have provided support to terrorist organizations. The CRA attempts to justify its false allegations by citing to newspapers articles and editorials that lack credibility, as a basis for their statement. Some of the articles and editorials don't even mention WAMY but the CRA inexplicably managed to connect WAMY to illegal activities.

The CRA cited to the following in support of their statements:

> *"The July 29, 2006, edition of the Indian Express reported that WAMY (Saudi Arabia) has been providing funding to, the Students Islamic Movement of India (SIMI), an organization that has been banned by the Indian*

2

> *Government for its, anti-government activities.   We note
> that SIMI's Secretary-General, Mr. Safiar Nagori, who has
> been identified in media reports as an important figure in
> the global jihadist movement, was arrested in connection
> with July 11,2006, bombings in Mumbai, India; SIMI is
> also believed to have links to Lashkar-e-Tayyiba. Laskhar-
> e-Tayyiba (LeT) was listed as terrorist entity pursuant to s.
> 83.05 of the Criminal Code (Canada) on July 18, 2003.*
> (August 23, 2011 letter at pages 9-10).

Such dubious and slanted media editorials have no legal value. It is
astounding to say the least that a governmental organization such as the CRA
would refer to and incorporate such meritless sources as supporting any
connection of WAMY Saudi Arabia to terrorism. In many of the statements
WAMY's name was not even mentioned, yet the CRA managed to somehow
connect WAMY to other organizations and terrorism. CRA has not
demonstrated how WAMY provided funding to SIMI, if any. Or what
connection WAMY has or had with the alleged secretary general of SIMI,
Mr. Safiar Nagori. The CRA clusters WAMY along with other organizations
that have been designated by the United Nations without providing evidence
to support their statements.

> • *A report in the October 2005 issue of the Jamestown
> Foundation's Terrorism Monitor alleges that WAMY
> (Saudi Arabia) is providing funds to Islamic militants in
> the Nigerian state of Yobe through a British organization
> affiliated with WAMY (Saudi Arabia), the Muslim World
> League (MWL) and the International Islamic Relief
> Organization (IIRO).  On November 9, 2006 the United
> Nations Security Council approved the addition of the IIRO
> Indonesia branch office (a.k.a., The Human Relief
> Committee of the Muslim World League) to the list of
> entities belonging to or associated with the Al-Qaida
> organization.   The Philippine and Indonesian branch
> offices of the IIRO, a.k.a., The Human Relief Committee of
> the Muslim World League have been closed for ties to
> terrorist financing.* (August 23, 2011 letter at page 10).

This report did not say the funds were from WAMY. Yet, the CRA
attempts to connect WAMY. This report said the funds were from al-
Muntada al-Islamic. Further Jamestown Foundation is an extreme rightwing

3

foundation with a clear anti-Islamist agenda. The CRA by quoting reports from such ideologically driven foundations and not verifying the truth or accuracy of the reporting can be tantamount to CRA endorsing the views of such organizations.

> • *The April 12, 2002, edition of the Arab News reported that WAMY (Saudi Arabia) was increasing its monthly contribution to the Palestinian intifada to $2.7 million (USD). This increase was in addition to another $70. Million (USD) that had been collected through WAMY offices abroad; (August 23, 2011 letter at page 10).*

Even assuming this report is true, which is not, it does not mean that WAMY supports terrorism. The <u>CRA seems to use the complicated, religiously and politically charged Israeli-Palestinian conflict which has endured for decades to connect WAMY to terrorism.</u>

> • *Jamaluddin B. Hoffman's report, <u>Guide to Wahhabi Organizations in North America</u>, identifies WAMY as the sister organization to the MWL, which he categorizes as " ... the most important and influential Wahhabi organization in the work, effectively serving as the ideological headquarters for Islamic extremists worldwide. The MWL conducts its work through branch offices and affiliate organizations established in countries. All over the world ... Many of those groups have, direct links to the al-Qaeda terrorist network and other terrorist organizations. Hoffman also describes WAMY (Saudi Arabia) as "... the youth [wing] of the transnational extremist movement.... "* (August 23, 2011 letter at page 10).

WAMY is not MWL. WAMY will not judge or discuss MWL's operations and principles. However, if MWL is alleged to support Wahhabism, does not mean WAMY supports the same. In addition, the CRA attempts to convolute the Wahabism, a political theory and somehow connects Saudi charitable organization to terrorism. Such statements are not only egregious but demonstrate either the lack of knowledge and understanding of these matters or the CRA did not bother to ascertain the sources it reviewed. Collecting information from blogs and editorials and using that to issue a governmental report is concerning and highly prejudicial to WAMY. In its report the CRA went on to state:

4



> • *A BBC Worldwide Monitoring Report, dated November 23,*
> *2006, indicates that the Egyptian Government refused to*
> *issue an entry visa to Qazi Hussain Ahmad, chief of the*
> *Jamaai-i-Islami; Mr. Ahmad had been invited by WAMY*
> *(Saudi Arabia) to its 10th Annual General Convention.*
> *Jamaat-i-Islami is a Pakistani based political party*
> *founded by Syed Abul Ala Maududi. The Jamaat-i-Islami's*
> *militant wing Hizbul Mujahideen is a listed entity in the*
> *European Union.*
>
> *According to the Hudson Institute, Jamaat-i-Islami*
> *provided funds and military training to various Islamist*
> *liberation movements from places such as Chechnya and*
> *Bosnia. During the Soviet occupation of Afghanistan,*
> *Jamaat-i-Islami provided direct support to the Afghan*
> *mujahideen based in Pakistan. It also hosted many of the*
> *Arab mujahideen who had come to participate in the*
> *insurgency. During the Soviet occupation of Afghanistan,*
> *JI also maintained close links to Gulbeddin Hikmatyar's*
> *Hizbe Islami, a listed terrorist entity in Canada.* (August
> 23, 2011 letter at page 11).

In the above two examples, again the CRA relies on media
institutions' writings, which lack legal ground or basis and do not even
connect WAMY to anything except for an alleged invitation. Even if there
was allegation that WAMY invited Qazi Hussain Ahmad, that does not mean
WAMY was involved or has been involved in terrorist activities. In addition,
the CRA seems to use the same recycled information used by the Plaintiffs in
*Re: Terrorist Attack on September 11, 2001*, 03 MDL 1570 (GBD) (FM), to
connect invitations, seminars or other forms of remote and non-existing
connection to state that WAMY has been connected to terrorist activities.
While these reports, editorials and newspapers articles do not have to offer
any legal basis for expressing their opinions, the CRA as a governmental
agency has the duty and an obligation to independently ascertain the facts
and provide verifiable evidence before it claims WAMY Saudi Arabia has
ever had anything to do with terrorism.

The CR's letters also state:

5



> • *Testimony by terrorism consultants and analysts Matthew Epstein and Evan Kohlmann before the United States Senate Committee alleges that WAMY supports terrorism: In approximately 1993, in conversations with former senior al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified three Muslim charities [including the World, Assembly of Muslim Youth] as the primary sources of Al-Qaeda financial and fund raising activity.*
>
> *These three organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al Qaida personnel worldwide, and helping 'to move funds to areas where Al-Qaeda was carrying out operations.'*
>
> *According to a U.S. Justice Department brief on the subject:*
> *'[Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' 'books as expenses for building mosques or schools or feeding the poor and needy.'"* (August 23, 2011 letter at pages 11 - 12).

These statements by CRA are not only baseless but assume facts that have not been established and treat them as true statement of facts. The testimonies of Matthew Epstein and Evan Kohlmann before the United States Senate Committee are simply their opinions and have no legal basis or supporting evidence. The CRA report contains no direct evidence showing that WAMY intentionally funneled money for terrorist activities. The CRA is using the same recycled information to connect WAMY to illegal activities without foundation, merit or supporting evidence. The CRA does not demonstrate how WAMY allegedly supported terrorism.

WAMY is not a sister organization of any other charity or organization. The CRA should have done its due diligence before perpetuating unfounded allegations that WAMY is a sister organization of the MWL. Similarly simple research would

have shown the CRA that WAMY has no relation whatsoever with any Pakistani based political party or any wing of the Mujahideen. The CRA as a governmental agency should verify its facts before painting an organization in false light, and associating it with terrorism.

Working in Kashmir and the Philippines (August 23, 2011 letter at page 9 – reference to WAMY funding SIMI), does not make WAMY connected to terrorist activities. If the CRA has any evidence to show to the contrary, we would like to receive it.

### WAMY's Alleged Support for Extremism and Intolerance

While the CRA cited that WAMY Canada did not serve its role as a not for profit organization under Canadian law such as of public benefit/promotion, they accused WAMY without any basis or evidence of intolerance and equated it with terrorism. The CRA stated "material produced by WAMY (Saudi Arabia)" in our view appears to promote intolerance, and/or advocate violence against non-Muslims and/or the use of violence as a means to bring about political or societal change." CRA then listed the following.

> * *The MWL pamphlet, A Dialogue on the Internet, distributed by WAMY (Canada), states that "Christians living with Muslims in the east...have always enjoyed the tolerance and good treatment of Islam ... unfortunately Western Christians preferred and still prefer to he the enemies of Islam and Muslims* (August 23, 2011 letter at page 18).

The CRA correctly identities this pamphlet as MWL. Without addressing the issue of intolerance, WAMY questions the rationale that the publication is WAMY's.

> * *An affidavit filed in U.S. District Court in Virginia by David Kane, a Senior Special Agent with the U.S. Department of Homeland Security, quotes excerpts from WAMY publications that appear to promote hatred arid intolerance:*
>
>   o *a WAMY publication entitled "A Handy Encyclopedia of Contemporary Religions and Sects" states that "[t] he Jews are humanity's enemies; they foment*

7

> *immorality in this world; the Jews are deceitful, they say something but mean the exact opposite." [sic]; and*

> o   *a 1991 WAMY (Saudi Arabia) publication entitled "Twajihat Islamiya" (Islamic Views) states "[t]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and Al-Quds [Jerusalem] when they go back to Islam and make Jihad for the sake of Allah."* (August 23, 2011 letter at page 18).

As an initial matter, Kane gives absolutely no context for these isolated statements. Viewing such statements out of context is dangerous and misleading. One could certainly accuse people of other faiths of intolerance based upon quotes from the Bible that "he that sacrificeth unto any god, save unto the Lord only, he shall be utterly destroyed," (Exodus 22:20). Indeed, the Bible contains many "text of terror." See "*Dark Passages: Does the harsh language in the Koran explain Islamic violence? Don't answer till you've taken a look inside the Bible.*" Boston Globe, March 8, 2009.

Mr. Kane does not provide any evidence to show his personal or direct experience with WAMY. All he does is attempt to interpret a camp song, and ends up making a far-fetched connection that WAMY supports the youth to become violent. Mr. Kane's interpretations demonstrate his lack of understanding of Arabic. For instance he makes reference to an interpretation to arm the youth. This has a different meaning in Arabic. Arming people with knowledge does not mean arming them with weapons. Further, Mr. Kane's information is derived from an article published in a website (National Review Online). A little research by CRA would have informed the CRA that nationalreviewonline.com   (cited   in   Kane   affidavit   as www.nationalreviewonline..com) is invalid URL. Also that the article which claims Islamic Views is a book by WAMY is by Jonathan Levin. Johnathan Levin is a blogger, who has described himself as "Boston-raised, midwest-educated attorney disgusted by government cronyism, nepotism, nihilism and narcissism. Amateur foreign policy wonk." CRA's repeating these statements without any independent fact checking is sloppy to say the least. The CRA must subject to greater scrutiny such biased and unsupported claims by right wing bloggers and activists.

Further, the CRA refers to Kane's affidavit to allege that a section in the Encyclopedia is entitled: "Heroes from Palestine." The section allegedly list individuals who attacked Israeli citizens, including the hijacking of a bus that killed 14 people. There is no such section in the encyclopedia. The encyclopedia

talks about the foundations and history, the belief systems, and practices of 58 different religions. No such section exists in the Encyclopedia.

A simple review of the Kane affidavit and the CRA would have found that he was relying on hearsay with incorrect information. For Instance the Kane affidavit claims that Ahmad Totonji was the first secretary of WAMY (referring to WAMY Secretary General). Ahmad Totonji has never been a Secretary General of WAMY.

> • *WAMY (Saudi Arabia) has published and distributed Mawlana Syed Abul Ala Maududi's book "Towards Understanding Islam," a copy of which was obtained from WAMY, (Canada) during the March 2004 audit. This book contains several paragraphs that appear to present an extremist, militant interpretation of the concept of jihad. In addition, Syed Maududi is also the author of "Jihad for the Sake of God," a work that is considered to be one of the more influential treatises on the subject of jihad. Syed Maududi is also the founder of the extremist Jamaat-e-Islami political party, an organization that is believed to have links to the Kashmiri based militant group, Hizbul Mujahideen.* (August 23, 2011 letter at page 18).

Simply because a book was part of the documents handed over to the CRA during the March 2004 audit, does not mean, WAMY was distributing the book. Without even going into the veracity of the statements made on the book, the CRA offers no evidence demonstrating that WAMY endorse the views expressed by the author of the book, supported those views or distributed copies of the book.

All the above allegations against WAMY by the CRA, were borrowed from the Plaintiffs in the civil multidistrict litigation currently going in New York (the *Re: Terrorist Attack on September 11, 2001*, 03 MDL 1570 (GBD) (FM)). The CRA cited to same newspaper articles, journals, blog entries, and unfounded testimony, as cited to by the Plaintiffs in MDL 1570.

In so far as the letters at issue discuss WAMY Saudi Arabia, the CRA relies on newspaper articles, editorials, false information from testimonies and discussions rather than official documents to make allegations against WAMY. While the CRA presented findings on WAMY Canada's irregularities, not related to terrorism, it ties WAMY Saudi Arabia to terrorism without any official documents or true and



LAW FIRM OF
**OMAR T. MOHAMMEDI, LLC**

verifiable facts. The CRA did not produce any independent evidence to support its claims against WAMY.

WAMY has never been charged, indicted or convicted of any wrong doing in any country. WAMY is not listed on any lists of designated terrorist organizations or even suspicious lists such as the United States Office of Foreign Asset Control ("OFAC"), or by the United Nations. If the CRA has any information to show otherwise we will be happy to receive it. Otherwise, WAMY Saudi Arabia demands that the CRA issue a retraction disavowing any allegation or statement that WAMY Saudi Arabia has any connection with or has ever supported terrorism or any terrorist organization including, but not limited to, Al Qaeda.

Sincerely,

Omar Mohammedi, Esq.

Frederick Goetz, Esq.

10